**Richard E. CROWE, Plaintiff,**

v.

**Marc B. TULL and Franklin D. Azar & Associates, P.C., a Colorado professional corporation, Defendants.**

**No. 04SA385.**

Supreme Court of Colorado, En Banc.

Jan. 9, 2006.

Winston Law Firm, P.C., Joseph R. Winston, LeHouillier & Associates, Patric L. LeHouillier, Colorado Springs, for Plaintiff.

White and Steele, P.C., Thomas B. Quinn, Jennifer C. Forsyth, Denver, for Defendants.

Kennedy Christopher Childs & Fogg, P.C., John R. Mann, Ronald H. Nemirow, Denver, for Amicus Curiae Colorado Defense Lawyers Association.

Hoffman, Reilly, Pozner and Williamson, LLP, Beth L. Krulewitch, Denver, for Amicus Curiae Colorado Trial Lawyers Association.

John W. Suthers, Attorney General, Jan M. Zavislan, Deputy Attorney General, Denver, for Amicus Curiae Colorado Attorney General.

Koff, Corn, & Berger, P.C., Michael H. Berger, Denver, for Amicus Curiae Colorado Bar Association.

Pryor Johnson Carney Karr Nixon, P.C., Elizabeth C. Moran, Greenwood Village, for Amicus Curiae Copic Insurance Company.

MULLARKEY, Chief Justice.

## I. Introduction

We exercised our original jurisdiction under C.A.R. 21 to determine whether a client may sue his or her attorney for violating the Colorado Consumer Protection Act ("CCPA") by using false or deceptive advertising to induce the client and other members of the public to hire the attorney. Specifically in this case, the petitioner, Richard Crowe, alleges that the respondents, Marc Tull and Azar & Associates ("Azar" or "the Azar firm"), employed a statewide marketing program, primarily through television advertisements, that portrayed the firm as highly skilled at negotiating with insurance companies and promised the firm would obtain full value for its clients' personal injury claims. Crowe alleges that he retained the Azar firm based on the representations made in its advertisements, the firm did not perform as advertised, and he was pressured into settling for only a fraction of the full value of his claim. According to Crowe, the Azar firm is a high-volume personal injury practice which relies for its profitability on quick settlements of cases with minimal expenditure of effort and resources by the firm. These business practices allegedly constitute an illegal scheme perpetrated on the public and enabled by the false or misleading advertising.

Crowe requested that we issue a rule to show cause why he should not be granted relief from the district court's dismissal of his claims for breach of fiduciary duty and violations of the CCPA. Crowe also requested relief from the trial court's denial of his

motion to amend his complaint and the partial grant of Azar's motion for a protective order regarding discovery.[1] We issued the rule to show cause and now make that rule absolute.

■ We conclude that attorneys may be held liable for violations of the CCPA. We reject both the argument that attorneys are exempt from the CCPA and also the alternative argument that a special test for CCPA liability applies to attorneys. Rather, we apply to attorneys the test developed in our CCPA caselaw. A private claim for relief under the CCPA against an attorney must allege that the attorney or law firm knowingly engaged in a deceptive trade practice, which occurred in the course of the attorney or firm's business, vocation, or occupation, significantly impacting the public as actual or potential consumers of legal services, and causing injury in fact to a legally protected interest of the plaintiff.

In this case, the trial court barred Crowe from asserting a CCPA claim involving an attorney's "actual practice" of law. We remand to the district court to allow Crowe to replead the CCPA claim and for further proceedings consistent with this opinion.

## II. Facts and Prior Proceedings

For the purposes of this opinion, we accept Crowe's allegations of fact as true.

Azar & Associates is a law firm specializing in personal injury lawsuits. In television advertisements that air throughout Colorado, the Azar firm represents itself as a firm that can recover money for its clients that other attorneys cannot. The commercials claim that the Azar firm will always "obtain as much as we can, as fast as we can" for its clients. One of the firm's commercials employs the slogan "In a wreck, get a check"

while another portrays Franklin Azar, the President of the Azar firm, as the "strong arm" who muscles insurance adjusters into paying up. Crowe claims that he saw the Azar firm's television commercials before and after he was injured in an accident and that the commercials caused him to retain the firm.

Crowe was involved in a multi-car accident in Colorado Springs. He suffered numerous physical injuries, including mild traumatic brain injury with speech impairment, and his vehicle sustained heavy damages. According to the police report, a seventeen year old driving a Dodge Ram truck caused the accident when he ran a stop sign and collided with Crowe's two-door Honda with an estimated impact speed of 45 mph.[2]

Crowe retained the respondents here, Tull and Azar, to represent him in his personal injury claim. Crowe was offered $4,000 by the truck driver's insurer to settle the claim and Tull advised him to accept the offer. Crowe relied on Tull's advice and accepted the $4,000 settlement offer.

In the petition now before us, Crowe claims that his case was not ripe for settlement at the time it was settled because he had not reached maximum medical improvement, resulting in undetermined damages such as future lost wages and rehabilitation costs. He contends that the amount of the settlement was far below the real value of his claim given that he had already accumulated over $17,000 in medical and rehabilitation costs and lost over $7,000 in wages at the time Tull advised him to settle the case for $4,000.

Crowe filed a timely suit against Tull and Azar, claiming professional negligence, violation of the CCPA, and breach of fiduciary obligation. Crowe's CCPA and breach of

1. Crowe's petition states the issues as follows: (1) Did the trial court abuse its discretion in dismissing the Plaintiff's claim for breach of fiduciary duty and violations of the CCPA. (2) Did the trial court abuse its discretion in denying the Plaintiff's motion to amend his Complaint. (3) Did the trial court abuse its discretion in partially granting the Defendant's motion for a protective order. Because we decide that Crowe may plead a CCPA claim, we reverse the order dismissing that claim and do not address the fidu-

ciary duty claim. In addition to rejecting Crowe's CCPA claim, the trial court issued a protective order preventing Crowe from discovering information about Azar's marketing and business practices. We also set aside the protective order and direct the trial court to allow discovery relevant to the CCPA claim.

2. The seventeen year old was charged with a traffic offense for failing to obey the stop sign.

fiduciary obligation claims were dismissed by the trial court, which found that those two claims duplicated Crowe's legal malpractice claim.[3] The court stated that the "actual practice of law" was not a commercial activity regulated by the CCPA and that the focus of Crowe's claims was the allegation of poor legal work. The court also reasoned that while the Azar firm's commercials may have lured Crowe to retain them, the commercials did not cause Crowe's alleged financial injuries.

Crowe attempted to ·amend his complaint to replead his claim for breach of fiduciary obligation and add claims for negligent and fraudulent misrepresentation. The trial court denied Crowe's request to amend, finding the additional claims duplicative of either the previously dismissed claims or the professional negligence claim. The trial court subsequently granted Tull and Azar's request for a protective order, preventing Crowe from obtaining discovery on matters related to Azar's business practices.

Crowe claims that the trial court abused its discretion in dismissing his claims for breach of fiduciary duty and violations of the CCPA. We granted Crowe's petition and invited various amici to submit briefs on the question of whether or not the CCPA was applicable to attorneys engaged in providing legal services, a question of first impression in Colorado.[4] Having heard arguments from all sides, we are persuaded by Crowe and the amici in support of the petitioner that attorneys are within the ambit of the CCPA.

In the next section, we will put Crowe's claim in context and examine the relevant statute and caselaw.

## III. Analysis

■ To prove a private claim for relief under the CCPA, a plaintiff must show:

(1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; ·(3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142, 146–47 (Colo.2003) (citing *Hall v. Walter,* 969 P.2d 224, 235 (Colo.1998)).

The trial court ruled that Crowe's CCPA claim duplicated· his legal malpractice claim and that the practice of law is not a commercial activity governed by the CCPA. Tull and Azar argue that the trial court's ruling was correct, that the claims were duplicative, and that the majority of state courts has found that deceptive trade claims do not apply to the practice of law. Therefore, according to the respondents, the CCPA should not apply to them as legal practitioners. We reject this argument.

■■ In determining whether the CCPA applies to attorneys, we are guided by the well-established principles of statutory construction we have applied in past CCPA cases. Whenever possible, we construe the CCPA to give its terms their plain and obvious meaning. *Hall v. Walter,* 969 P.2d 224, 229 (Colo.1998); *May Dep't Stores Co. v. State ex rel. Woodard,* 863 P.2d 967, 972 (Colo.1993). Our goal is to give effect to the intent of the General Assembly and we avoid constructions that defeat the legislature's intent. *Showpiece Homes Corp. v. Assurance Co. of Am.,* 38 P.3d 47, 51 (Colo.2001). The intention of the legislature prevails over a literal interpretation of the statute's plain and ordinary meaning that would produce an absurd result. *Id.; Walter,* 969 P.2d at 229.

### A. Legislative Intent

#### 1.

The CCPA was enacted in 1969 and there is no legislative record of the proceedings

---

3. The trial court dismissed the breach of fiduciary obligation claim without prejudice and indicated that Crowe could maintain the claim if he made separate and further allegations.

4. Amicus briefs were submitted by various parties, including the Colorado Bar Association, the Attorney General's office, the Colorado Trial Lawyer's Association, Copic Insurance Company, and the Colorado Defense Lawyers Association.

that led to its passage. *See Showpiece Homes,* 38 P.3d at 51. A Colorado Legislative Council Report published prior to passage of the CCPA describes Colorado's first false and misleading advertising law, which was based on the *"Printer's Ink* Model Statute," and originated in 1915.[5] Legislative Council Report to the Colorado General Assembly, *Consumer Problems in Colorado,* Research Publication No. 112 (Nov.1966). The *Printer's Ink* statute remained in effect until the CCPA was passed in 1969. The CCPA was Colorado's version of the Uniform Deceptive Trade Practices Act. *See People ex rel. Dunbar v. Gym of America, Inc.,* 177 Colo. 97, 107, 493 P.2d 660, 664–65 (1972). The new statute was considered necessary, at least in part, due to the rise in unchecked "bait-and-switch" advertising practices and the use of "phony price comparisons" in advertisements. *Consumer Problems in Colorado* at xviii.

■ The CCPA was enacted to provide "prompt, economical, and readily available remedies against consumer fraud." *Western Food Plan v. Dist. Court,* 198 Colo. 251, 256, 598 P.2d 1038, 1041 (1979). This court has taken "[a]n expansive approach ... in interpreting the CCPA by reading and considering the CCPA in its entirety and interpreting the meaning of any one section by considering the overall legislative purpose." *May Dep't Stores Co.,* 863 P.2d at 973 n. 10. Previously, we have stated that "in determining whether conduct falls within the purview of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct. That assumption is appropriate because of the strong and sweeping remedial purposes of the CCPA." *Showpiece Homes,* 38 P.3d at 53.

These purposes must be applied to an ever-evolving commercial marketplace. The change has been especially dramatic for attorney advertising which was once strictly forbidden by ethical codes. Less than 30 years have passed since the Supreme Court held, in *Bates v. State Bar of Arizona,* that blanket suppression of attorney advertising was unconstitutional and that such advertising was entitled to First Amendment protection as commercial speech. 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Since *Bates,* attorney advertising has become ubiquitous. *See* Jill Schachner Chanen, *Watch What You Say,* ABA Journal, October 2005, at 59–63. It appears in print media including telephone directories, newspapers, and ·billboards. In addition, the electronic media of radio, television, and the internet are widely used by attorneys advertising their services to the public.

Deceptive marketing practices are not the sole domain of the bait-and-switch retailer or the purveyor of phony price comparisons. Since the CCPA was enacted, the role and reach of advertising has expanded and with it the potential for fraud. Our cases have consistently applied the CCPA to advertising and marketing practices that fit within its tenets based on the applicability of the Act to the actions alleged and without regard to the occupational status of the defendant. *See Showpiece Homes,* 38 P.3d 47 (CCPA applies to insurance industry); *Martinez v. Lewis,* 969 P.2d 213 (Colo.1998) (CCPA claim against physician considered and denied on its particular facts); *Walter,* 969 P.2d 224 (nonconsumer landowners had standing to bring CCPA action against developers).

The CCPA applies to any "person [who] engages in a deceptive trade practice ... in the course of such person's business, vocation, or occupation." § 6–1–105(1), C.R.S. (2005). The statute applies to representations related to "services" throughout. *See, e.g.,* § 6–1–105(1)(g)–(j). There is no specific mention of professional services. Consequently, the plain language of the CCPA is silent on whether it applies to lawyers.

The absence of the term "professional services" is ambiguous. It could indicate that the legislature did not intend the CCPA to apply to attorneys. On the other hand, several jurisdictions that exclude attorneys from their consumer protection acts, rather than relying on legislative silence, have done so explicitly by inserting explicit exclusions in the statute. *See* D.C.Code § 28–

---

**5.** The *"Printer's Ink* Model Statute"* was so called because it was based on a model law drafted by the *Printer's Ink* advertising journal in 1911.

3903(c)(2)(C) (2005); MD.Code Ann., Com. Law § 13–104(1) (West 2005); N.C. Gen.Stat. Ann. § 75–1.1(b) (West 2005); Ohio Rev. Code Ann. § 1345.01(A) (West 2005); Tex. Bus. & Com.Code Ann. § 17.49(c) (Vernon 2005).

In *Martinez*, we considered a CCPA claim against a physician. 969 P.2d 213. While we found that the plaintiff had failed to establish a CCPA claim, we based our holding on the plaintiff's failure to show a public impact, not the defendant's status as a medical professional. *Martinez*, 969 P.2d at 222–23. We found that the plaintiff had sufficiently pleaded the first two elements of a CCPA claim because her allegations supported an inference that the defendant physician had engaged in an unfair or deceptive trade practice in the course of his business practice. *Id.* at 221–22. Our opinion in *Martinez* indicated that a doctor could be subject to liability under the CCPA under the right conditions. The legislature has not acted to exempt medical professionals, or learned professionals in general, from the CCPA since our holding in that case.

■ Moreover, the CCPA does refer to deceptive trade practices in the pursuit of one's "vocation," a term that has been defined as "one's occupation or profession." *Black's Law Dictionary* 1568 (7th ed.1999). The inclusion of the term "vocation" in the CCPA's statutory language, abiding by our principle of liberal construction in interpreting the statute, indicates that the legislature intended that professionals may be held accountable under the Act.

Furthermore, we have found that the omission of a specific mention of a particular industry in the CCPA was not determinative of whether that industry was covered by the Act. In *Showpiece Homes*, we asserted that "[t]he CCPA does not list all the industries to which it applies, nor does it specify all the types of transactions it covers." 38 P.3d at 54. In that case, the business of insurance, although it was not specifically mentioned in the CCPA, was within the purview of the CCPA because deceptive practices in that industry could have a significant public im-

pact. *Id.* Limiting the practices covered by the CCPA to those specifically enumerated in the Act would frustrate its intended broad remedial power. *Id.*

We also found it persuasive that insurance companies were not among the persons and entities expressly excluded from the provisions of the CCPA. *Id.; see* § 6–1–106(b). Similarly, the legal profession is not explicitly excluded from the Act. Since the CCPA was enacted in 1969, the legislature has had ample opportunity to exclude attorneys from liability under the Act, and the "omission of an exemption .... strongly indicates that the General Assembly did not intend such an exemption." *Showpiece Homes*, 38 P.3d at 54. In accord with our holding in *Showpiece Homes*, this court will not grant lawyers a blanket exemption from liability under the CCPA where the General Assembly has not done so. *Id.*

2.

The parties have argued the merits of this case under the Supreme Court of Washington's holding in *Short v. Demopolis*, speculating that we may adopt its standard. 103 Wash.2d 52, 691 P.2d 163 (1984). Washington state "has long served as a model for the development of consumer protection legislation." *Walter*, 969 P.2d at 233. We have previously looked to decisions of the Supreme Court of Washington for guidance in interpreting the CCPA. *See, e.g., Showpiece Homes*, 38 P.3d at 54.

The *Demopolis* court considered the argument that Washington state's consumer protection act (for the purposes of this opinion, the "WCPA") was inapplicable to attorneys because the practice of law was not "trade or commerce" as defined by the Act. 691 P.2d at 165. Washington's consumer statute defined "trade or commerce" as "the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." Wash. Rev.Code § 19.86.010(2) (2005).[6]

The *Demopolis* court found that the WCPA applied to attorneys when engaged in

---

6. The current year is cited for convenience because the statutory definition remains unchanged

from the one considered in *Short v. Demopolis*, 103 Wash.2d 52, 691 P.2d 163 (1984).

"certain entrepreneurial aspects of the practice of law" that fit the definition of "trade or commerce" based on the legislature's prescription to follow federal law and construe the WCPA liberally. 691 P.2d at 168. The court divided the activities of attorneys into two categories, the "actual practice" of law and the entrepreneurial aspects of legal practice, and exempted attorneys engaged in the "actual practice" of law from WCPA liability. *Id.*

Entrepreneurial aspects of legal practice which may give rise to WCPA claims include "how the price of legal services is determined, billed, and collected and the way a law firm obtains, retains, and dismisses clients." *Id.* The "actual practice" of law includes "those claims [that] go to the competence and strategy of lawyers, and not to the entrepreneurial aspects of practice." *Eriks v. Denver*, 118 Wash.2d 451, 824 P.2d 1207, 1214 (1992); *see also Demopolis*, 691 P.2d at 168. Therefore, attorney malpractice and negligence claims were exempt from Washington's consumer protection act. *Eriks*, 824 P.2d at 1214; *Demopolis*, 691 p.2d at 168.

Tull and Azar argue that Crowe's claims are based on Tull's allegedly negligent settlement recommendation which constitutes the "actual practice" of law and should be exempt from CCPA liability under the *Demopolis* test. They argue that subjecting their actions here to liability under the CCPA will convert every future malpractice claim against a lawyer who happens to advertise into a CCPA claim.

The CCPA does not contain a broad "trade or commerce" provision such as the one analyzed in *Demopolis*. *See* Wash. Rev.Code § 19.86.020.[7] Much of the statute's text is devoted to defining various deceptive practices to which it applies. § 6–1–105. Sections 6–1–105(1)(g) and (i) are applicable here. Section 6–1–105(1)(g) creates liability when an advertiser represents that services are of a particular quality when the advertiser "knows or should know" they are of another quality. Section 6–1–105(1)(i) creates liability for advertising services with intent not to provide them as advertised.[8]

A CCPA claim will only lie if the plaintiff can show the defendant knowingly engaged in a deceptive trade practice. David Benjamin Lee, *The Colorado Consumer Protection Act: Panacea or Pandora's Box?*, 70 Denv. U.L.Rev. 141, 154–55 (1992). The CCPA "provides an absolute defense" to a misrepresentation caused by negligence or an honest mistake. *Id.* Liability, therefore, is dependent upon knowledge or intent existing at the time of the advertising conduct and the remediable damage that results from that conduct. The CCPA does not create liability for those who intend to live up to the pronouncements of their advertisements, but are negligent in action despite those intentions.

■ Therefore, mere advertising by an attorney lacking the intent to defraud will not convert a malpractice claim into a CCPA claim. The element of intent, explicitly required by the statute, eliminates the concern that all professional negligence claims may be converted into CCPA claims.

Furthermore, the CCPA and common-law professional negligence differ in the sort of harms they are meant to deter, and, when necessary, the sort of harms for which an injured party can be compensated. The CCPA protects all consumers of legal services from the perpetration of fraud on the public. It includes a private claim for relief with enhanced damages as an incentive for an injured party and as a deterrent to fraudulent behavior. *See* § 6–1–113. The crux of a CCPA claim is a deceptive trade practice, which, by definition, must be intentionally inflicted on the consumer public. A malprac-

---

7. The section reads: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

8. The two subsections cited read:
(1) A person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person:

(g) Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another; ...
(i) Advertises goods, services, or property with intent not to sell them as advertised ...
§ 6–1–105, C.R.S. (2005).

tice action, by contrast, serves to make an individual client whole and results from the tortiously deficient performance of services specific to that individual client's legal matter. *See, e.g., Bebo Constr. Co. v. Mattox & O'Brien, P.C.,* 990 P.2d 78, 83 (Colo.1999).

We have also been urged by amici in favor of the petitioner not to adopt the *Demopolis* standard because it may allow unscrupulous attorneys to insulate themselves from liability using methods traditionally thought of as part of the "actual practice" of law. The CCPA, it is argued, should not only apply to activities that are solely entrepreneurial in nature; it should also apply in situations in which activities considered part of the traditional practice of law are used in tandem with entrepreneurial activities to commit a fraud on the public.

Tull and Azar argue that even if some dint of financial consideration was present in the settlement recommendation to Crowe, the presence of that consideration does not turn an act of legal judgment into an entrepreneurial one. A settlement offer will always trigger a cost-benefit analysis in which financial considerations necessarily enter into an attorney's calculus. They assert that the presence of financial considerations alone should not transform conduct consistent with the actual practice of law into entrepreneurial conduct actionable under the CCPA. *See Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Investors, L.P.,* 260 Conn. 766, 802 A.2d 44, 53–54 (2002) ("Using an attorney's financial considerations as a screening mechanism for separating professional actions from entrepreneurial ones would dissolve the distinction between the two, subjecting attorneys to [consumer act] claims for any decision in which profit conceivably could have been a factor.").

This argument fails when matched up against the allegations of the petitioner. Crowe claims that the Azar firm's viability and profitability as a business depend upon intentionally short-changing its clients. The firm allegedly acquires those clients by misleading them, through advertising, to expect high quality legal services, signs those clients to contingency contracts, and then settles cases as expediently as possible without ex-

pending the effort or resources necessary to determine and recover the reasonable value of the claims. In this scheme as alleged, the exercise of legal judgment is not colored by the dint of financial considerations—the financial considerations of the firm are the only factor involved.

■ We are convinced by our reading of the CCPA that a judicially forged distinction between the professional and entrepreneurial activities of attorneys, exempting the "actual practice" of law from CCPA liability, is not the proper vehicle for analyzing a deceptive trade practice claim against a lawyer. There is no basis for making such a distinction in the plain language or the legislative history of the Act. Moreover, as has been rightly argued, application of that standard could potentially inoculate attorneys from liability when an aspect of the "actual practice" of law contributes to a scheme to commit deceptive trade practices.

In light of the different functions, purposes, and targets of the CCPA and attorney malpractice under the common law, we decline to adopt the mechanical test of *Demopolis* to delineate which behaviors expose attorneys to liability under the Act. The proper test for CCPA liability under our law is whether or not an attorney's conduct constitutes a deceptive trade practice with the requisite intent and meets the elements of public impact and causation as explained in *Hall v. Walter,* 969 P.2d 224 (Colo.1998).

■ Therefore, we conclude that attorneys may be found liable for CCPA violations under the best interpretation of the Act's plain language and consistent with its legislative intent.

## B. Separation of Powers

■ Article III of the Colorado Constitution prevents one branch of government from exercising powers that the constitution makes the exclusive domain of another branch. *Dee Enters. v. Indus. Claim Appeals Office,* 89 P.3d 430, 433 (Colo.App. 2003). The separation-of-powers doctrine "does not require a complete division of authority among the three branches, however, and the powers exercised by different

branches of government necessarily overlap." *Id.*

One line of reasoning here posits that enforcement of the CCPA against attorneys would create a dual regulatory system for attorneys, allowing the legislature to invade the exclusive province of this court and its disciplinary process, violating the separation of powers doctrine. Therefore, the CCPA would be preempted by our court's regulation of attorneys.

The other side would have it that the CCPA does not regulate the practice of law and does not interfere with this court's regulatory powers. The legislature is within its power to enact laws which subject attorneys to penalties, with criminal statutes as an example of that authority.

This court "as part of its inherent and plenary powers, has exclusive jurisdiction over attorneys and the authority to regulate, govern, and supervise the practice of law in Colorado to protect the public." *Colorado Supreme Court Grievance Comm. v. Dist. Court,* 850 P.2d 150, 152 (Colo.1993); *see also In re Wimmershoff,* 3 P.3d 417, 420 (Colo.2000). We have described our regulatory authority over attorneys as the

> "exclusive power to admit applicants to the bar of this State; to prescribe the rules to be followed in the discipline of lawyers; and to revoke a license to practice law, or otherwise assess penalties in disciplinary proceedings."

*Supreme Court Grievance Comm.,* 850 P.2d at 152 (quoting *Petition of the Colorado Bar Ass'n,* 137 Colo. 357, 366, 325 P.2d 932, 937 (1958)). In the past, we have drawn a firm line in reserving the authority to conduct disciplinary proceedings and in the exercise of our exclusive jurisdiction to regulate the practice of law. *See id.* at 153 (district courts have no subject-matter jurisdiction over action that would interfere with ongoing disciplinary proceedings).

We have recognized, however, that some overlap between judicial rulemaking and legislative policy is constitutionally permissible as long as the overlap does not create a substantial conflict. *People v. McKenna,* 196 Colo. 367, 585 P.2d 275 (1978)

(rape shield statute was not unconstitutional legislative attempt to create rule of procedure for judiciary); *see People v. Buckles,* 167 Colo. 64, 453 P.2d 404 (1968) (law that disqualified convicted felon from practicing as attorney did not violate separation of powers). In *Buckles,* we regarded the statute barring convicted felons from practicing law as an exercise of the legislature's police power. The law did not violate the separation of powers doctrine because it did not interfere with our exclusive right to determine the rules governing admission to the bar or under which attorneys were disciplined. *Buckles,* 167 Colo. at 68, 453 P.2d at 406.

Similarly, in *McKenna,* the legislature's enactment of a rape shield statute did not overstep the bounds of its constitutional authority under Article III. We recognized that the rape shield statute was aimed at important social policy goals which made it "far more than merely a legislative attempt to regulate the day-to-day procedural operation of the courts." *McKenna,* 196 Colo. at 372, 585 P.2d at 278. In the absence of a conflicting rule of this court, we upheld the statute in order not to frustrate its policy goals. *Id.* at 372–73, 585 P.2d at 278–79.

In considering whether there is a conflict between the CCPA and the attorney regulatory system, we look to analogous rules of statutory construction. When two statutes attempt to regulate the same conduct, the more specific statute preempts the general statute. *Showpiece Homes,* 38 P.3d at 53. Preemption results only to the extent there is a "manifest inconsistency" between two statutes attempting to regulate the same conduct because "statutory repeals by implication are disfavored." *Id.* If there were such a manifest inconsistency between the effect of the CCPA when applied to attorneys and the Professional Rules of Conduct, the CCPA would be preempted by the disciplinary scheme. It is our charge, however, to attempt to construe the professional rules harmoniously with the CCPA, giving effect to all of their parts. *See id.*

In *Showpiece Homes,* in finding that the CCPA applied to the insurance industry, we

stated that "[t]he CCPA is meant to work in tandem with other regulatory provisions in the Colorado statutes." 38 P.3d at 49. That case addressed whether the Unfair Claims—Deceptive Practices Act ("UCDPA") provided the exclusive remedy against insurers, foreclosing a CCPA claim for relief. The CCPA was applicable because the UCDPA provided for general regulation of the insurance industry, but did not provide private claims as redress for losses suffered due to an insurance company's negligence, default, or tort. *Id.* at 53. While the two statutes possessed different enforcement methods and penalties, the differences did not rise to the level of a conflict. *Id.* at 53–55.

We likewise find that there is no manifest inconsistency between the CCPA and the attorney regulatory system. First, the express terms of the CCPA bar its application to actions sanctioned by other regulations. Section 6–1–106 provides that the CCPA does not apply to "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency." § 6–1–106(1)(a). This section does not, however, grant a wholesale exemption to any industry or occupation that is subject to regulation. If we were to read section 6–1–106 to exempt any regulated industry, "the CCPA would be rendered meaningless because almost every business is subject to some type of regulation." *Showpiece Homes*, 38 P.3d at 56. Attorney conduct that constitutes deceptive or unfair trade practices is not "in compliance" with the rules of professional conduct and is not exempted from CCPA liability by section 6–1–106.

Second, the relevant provisions of the CCPA are not inconsistent with the prohibition on misleading communications in the professional rules. The consumer act's prohibitions against misleading statements and misrepresentations of the quality of services echo the disciplinary rules. *Compare* § 6–1–105(1)(g), *with* Colo. RPC 7.1.[9] There is no conflict between the CCPA and the profes-

sional rules in the types of conduct proscribed.

Third, the remedies of the CCPA differ in purpose, consequence, and method of enforcement from the remedies employed by Colorado's attorney disciplinary scheme. The CCPA's purpose is to remedy consumer fraud. *Western Food Plan v. Dist. Court*, 198 Colo. 251, 256, 598 P.2d 1038, 1041 (1979). An injured party who prevails under the CCPA may recover treble damages and attorney's fees. § 6–1–113. Awarding treble damages serves to deter fraudulent practices, to punish those who engage in those practices, and to encourage private enforcement of the statute. *Lexton–Ancira Real Estate Fund, 1972 v. Heller*, 826 P.2d 819, 822 (Colo. 1992). These remedies provide redress to private citizens affected by deceptive trade practices and promote the CCPA's function as a general deterrent, discouraging fraud on the public through the large potential damage exposure. *See May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 972–973 (Colo.1993).

The attorney disciplinary system is also intended to protect the public by correcting and preventing individual attorney misconduct. *In re Cardwell*, 50 P.3d 897, 904 (Colo. 2002). It employs specific deterrence through the threat of compromising an attorney's ability to practice law and through the disapprobation of the legal community, generally. Violation of the Rules of Professional Conduct may result in disciplinary action against the offending attorney. *See* Colo. RPC 7.1–7.4. Potential disciplinary actions for violating a professional rule include disbarment, suspension of the attorney's license, public censure, and private admonition. C.R.C.P. 251.5, 251.6. The rules do not provide a monetary remedy to a client harmed by an attorney's misrepresentation of the quality of the attorney's services.

The primary purpose of lawyer regulation proceedings is to protect the public, not to punish an offending lawyer. *Cardwell*,

---

9. See Note 8 for the text of § 6–1–105(1)(g). Rule 7.1(a)(2) reads:

(a) A lawyer shall not make a false or misleading communication about the lawyer or the

lawyer's services. A communication is false or misleading if it: ... (2) is likely to create an unjustified expectation about results the lawyer can achieve ...

50 P.3d at 904. The regulatory system serves a watchdog function, protecting the public interest by maintaining the integrity of the bar. While safeguarding the public against consumer fraud may at times be an ancillary consequence of the disciplinary system, its rules and remedies are not tailored to that specific purpose. Applied to attorneys, the CCPA complements, rather than contradicts, this court's implementation of the professional rules and can not be seen "as impinging in any real sense upon our further right to discipline those licensed by us to practice law." *Buckles,* 167 Colo. at 68, 453 P.2d at 406; *see also Heslin v. Connecticut Law Clinic of Trantolo & Trantolo,* 190 Conn. 510, 526, 461 A.2d 938, 946 (1983) ("[The Connecticut consumer protection act] in no way relieves attorneys of the ethical duties imposed on them by the [regulatory] code ... it provides distinctly separate remedies, different both in purpose and in form from the scheme of regulation envisaged by the code.").

### C. Public Impact

The CCPA "was enacted to regulate commercial activities and practices which, 'because of their nature, may prove injurious, offensive, or dangerous to the public.'" *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142, 146 (Colo. 2003) (quoting *People ex rel. Dunbar v. Gym of America, Inc.,* 177 Colo. 97, 112, 493 P.2d 660, 667 (1972)) (finding no significant public impact in franchise dispute that affected only 3 of 550 dealers of polyurethane truckbed and industrial linings). The Act "deters and punishes businesses which commit deceptive practices in their dealings with the public by providing prompt, economical, and readily available remedies against consumer fraud." *Id.*

In *Rhino Linings,* this court stated that there were at least three factors to consider in determining whether a challenged practice impacts the public under the CCPA:

(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future.

*Id.* at 149. The CCPA can not be used to remedy a purely private wrong. *Id.; Martinez v. Lewis,* 969 P.2d 213 (Colo.1998) (insured could not bring CCPA claim against physician who falsely represented his qualifications to insurer because alleged deceptions occurred in context of physician's private agreement with insurer and did not impact public as consumers).

One approach has it that the CCPA is inapplicable to attorneys because the attorney-client relationship is always a private contract with no effect on the greater public. The Washington Supreme Court has found, under its own consumer protection act, that "[a] breach of a private contract affecting no one but the parties to the contract, whether that breach be negligent or intentional, is not an act or practice affecting the public interest." *Lightfoot v. MacDonald,* 86 Wash.2d 331, 334, 544 P.2d 88, 90 (1976) (attorney's breach of contract that affected client but lacked public impact was not prohibited by consumer protection act).

We note here that the CCPA will not regularly accompany an attorney malpractice claim, because those cases in which a lawyer's actions will have an impact beyond the private contract with the client will be few and far between. In fact, the elements of malpractice are only incidental to liability under the CCPA, because liability under the consumer act originates from fraudulent misrepresentations of ability or quality of services, not the failure to perform legal services with a standard of care "ordinarily possessed by members of the legal profession." *Bebo Constr. Co.,* 990 P.2d at 83 (citation omitted). The typical malpractice case, then, will not be accompanied by a CCPA claim.

Nonetheless, the argument that the scope of damages caused by an attorney who engages in false advertising is defined only by the attorney-client relationship fails in the face of the realities of modern legal practice. *See Bates v. State Bar of Arizona,* 433 U.S.

350, 371–72, 97 S.Ct. 2691, 2703, 53 L.Ed.2d 810 (1977) ("the belief that lawyers are somehow 'above' trade has become an anachronism"). Contemporary advertising and marketing practices for attorney services more closely reflect the commercial marketplace as a whole and do not reflect the traditional image of the small-town practitioner hanging up a shingle and relying on personal contacts to create business. Marketing consultants and branding advisors are common tools in legal circles now. Many law firms resemble mid-size corporations rather than the image of small groups of like-minded professionals that still retains some hold on the popular consciousness.

Lawyer advertising today potentially affects a large swath of the public via television, print media, radio, and the internet. It is reasonable that special protections exist for those instances in which attorney marketing representations are falsely conveyed. Such protections are all the more necessary because the practice of law is complicated and information that allows the average consumer to discriminate among different legal service providers is limited. *See In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982) ("the potential for deception and confusion is particularly strong in the context of advertising professional services"). In many cases, the unsophisticated consumer will have only an attorney's or law firm's own representations of the quality of services with which to decide whether or not to retain that attorney or firm. Frequently, that decision must be made under the added pressure of a fast-running statute of limitations.

Attorney advertising is likely to have the most impact on the unsophisticated and the underprivileged segments of the public that are most in need of safeguards. Lawyers may target these communities because of their susceptibility to advertising. Due to the disparity in sophistication and expertise between an attorney and the typical consumer of legal services, "misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising." *Bates*, 433 U.S. at 383, 97 S.Ct. at 2709. This potential for consumer targeting demonstrates the need for the same protections against deceptive legal advertising as exist for other purveyors of goods and services. The CCPA was enacted for this very purpose, to protect vulnerable consumers and the consuming public as a whole. *See, e.g., Martinez*, 969 P.2d at 222.

■ There is ample justification in the realities of modern legal practice and its effects on the public for application of the CCPA to the deceptive trade practices of attorneys and law firms. Application of the CCPA to attorneys is consistent with the Act's broad intent and fulfills its purpose of protecting the public from fraud. We hold, therefore, that the CCPA applies to protect the vulnerable consumer of legal services and the consumer public as a whole in the situation in which the purveyor of those services knowingly misrepresents the quality and likely benefit of those services.

### D. Causation

■ Under section 6–1–113 of the CCPA, to maintain a private claim for relief, a plaintiff must demonstrate an injury in fact to a legally protected interest caused by the challenged deceptive trade practice. *Hall v. Walter*, 969 P.2d 224, 235–36 (Colo.1998).[10] The CCPA does not specify which injuries it is intended to prevent. *Id.* at 236.

The plaintiffs in *Walter* were landowners who suffered property damage and trespass when the defendants sold parcels of land which they misrepresented as accessible via the plaintiffs' land. Actual and prospective purchasers of the parcels consequently used the plaintiffs' land to access the parcels, causing damage to the locks and gates the plaintiffs had installed and causing lease negotiations for the land to break down. The defendants argued that the plaintiffs' injuries were not contemplated by the CCPA and the nexus between the deceptive trade practice

---

**10.** In contrast to a private action, a showing of actual injury is not required in a district attorney's or attorney general's action for civil penal-

ties. *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 972–973 (Colo.1993).

and the injury was too attenuated for recovery. *Id.*

We found that the physical and economic damage caused to the plaintiffs' property by trespassers was a legally protected interest under the CCPA. *Id.* at 236–37. Injury to the business value of the plaintiffs' property was "squarely within the interests that the CCPA is intended to protect." *Id.* at 236.

Similarly, in *May Dep't Stores Co.*, in analyzing section 6–1–112, the civil penalty provision of the Act, we found that a consumer was harmed by a defendant's violation of the CCPA if that consumer had been exposed to the defendant's deceptive advertisements and had either made purchases or had undertaken any other activities in reliance on the advertisements. 863 P.2d at 973–74. The fact that the witnesses alleging injury had expended time and effort considering the retailer's advertised merchandise was enough to find that they were affected consumers under the CCPA. *Id.* at 974.

Tull and Azar assert that Crowe could not have sustained damages caused by the Azar firm's advertisements. They contend that causation of Crowe's financial injury, if there was an injury, was due to Tull's legal advice, not the advertisements, and that Crowe's proper recourse is in a professional negligence claim. Crowe's CCPA claim duplicates a malpractice claim, the respondents argue, because Crowe will have to show that the Azar firm misrepresented the quality of their services by comparing the level of service he received to the standard of care ordinarily possessed by attorneys.

Crowe maintains that the Azar firm's actions, through its advertisements and due to its business plan, caused his injury. The Azar firm, he argues, is a "personal injury mill" and its business plan is to advertise extensively, take on more cases than it could reasonably expect to litigate, and settle those cases prematurely to maintain cash flow without regard to obtaining full value for its clients. Crowe contends that his injury was caused when he was misled by the Azar firm's advertisements into believing the firm would obtain the full value of his claim when it had no intention of doing so.

■■■ Tull and Azar are essentially arguing that there is not a sufficient nexus between the Azar firm's advertisements and Crowe's injuries. We reject their contention.

Causation is a question of fact reserved for the jury or trier of fact. *See Walter,* 969 P.2d at 236. Crowe's allegation is that he would not have suffered injury but for the Azar firm's television commercials that represented he would receive full value for his claim. The injury was the result of legal services that Crowe sought out as a consumer based on his reliance on the allegedly false or misleading advertising. This sort of consumer injury caused by a deceptive trade practice is what the CCPA is intended to protect against. *See* § 6–1–113. Under Crowe's theory, reliance on the advertising was the first link in a chain of causation that led to the undervalued settlement. The proposed causation chain is not too attenuated to submit to a fact-finder. *See Walter,* 969 P.2d at 236.

■■■ Likewise, Tull and Azar's position that Crowe's only viable theory of causation is through a professional negligence claim is unsupportable. The availability of "other statutory or common law causes of action based on the same set of facts does not affect the plaintiff's right to assert a claim under the CCPA." *Id.* at 237.

The two claims are not duplicative. As we stated above, it will be the rare case in which CCPA liability accompanies a malpractice claim. A malpractice action will seldom be accompanied by damages remediable under the CCPA because, as stated above, the test under the CCPA is not whether the attorney met a reasonable standard of care, but whether the attorney's conduct meets the elements of a deceptive trade practice under the statute. A CCPA claim by definition requires pleading elements other than those required by a malpractice claim.[11]

The alleged facts underlying Crowe's theory of causation in this case may or may not

---

11. We note that although the two claims are not duplicative, a plaintiff may only obtain damages on one of them so as to prevent double recovery. *See Lexton–Ancira Real Estate Fund, 1972 v. Hel-* *ler,* 826 P.2d 819, 822–25 (Colo.1992) (plaintiff was not entitled to recover compensatory damages on both common-law misappropriation claim and under CCPA).

ultimately convince a trier of fact. Today we find only that a CCPA claim against an attorney based on misrepresentative advertising is permissible and recovery may be awarded for injuries caused by the misrepresentation.

## IV. Application of the CCPA to This Case

We decline to bar Crowe from making a CCPA claim against his former attorneys. As stated above, we will not adopt the "actual practice—entrepreneurial aspects of law" distinction established by the Supreme Court of Washington in *Short v. Demopolis*.[12] The trial court in this case appeared to rely on this distinction and dismissed Crowe's CCPA claim on the grounds that claims related to the actual practice of law are not viable under the CCPA. We find that this exemption from CCPA liability is supported by neither the statutory language nor the intent of the General Assembly and is inconsistent with the consumer act's purpose.

Crowe's bare bones original complaint only sketches the elements of a CCPA offense. Nonetheless, Crowe's CCPA claim was dismissed by the trial court on improper grounds. Crowe's amended complaint and his petition, which flesh out Crowe's argument that the Azar firm is a "personal injury mill" using its advertising to deceive the public, show that Crowe is capable of asserting a claim that alleges the five elements of the CCPA, elucidated in *Walter*, and which we have held applicable to attorneys in this opinion. 969 P.2d 224. Therefore, in light of today's decision, we direct the trial court to permit Crowe to replead his CCPA claim.

We also note that in repleading, Crowe must allege facts sufficient to support the inference that Tull and Azar knowingly engaged in a deceptive trade practice which Crowe relied upon. *See Martinez*, 969 P.2d at 220–22 (medical doctor who misrepresented his ability to diagnose organic brain injury may have committed deceptive trade practice). Further, if Crowe fails to allege an injury other than a private wrong caused

only by the poor advice of his attorney, the injury will lack public impact and will be too narrow in scope to be covered by the CCPA. *See id.* at 220–23 (CCPA claim dismissed because misrepresentations were made only to patient's insurer). The original complaint failed to adequately set forth these elements.

Finally, we direct the trial court to reconsider the protective order which shut down discovery related to the Azar firm's advertising and marketing practices, including the production of its television, radio, and print advertisements, and certain of its operations and practices in serving past clients. These avenues for discovery were closed by the trial court after the CCPA claim was dismissed on improper grounds. Discovery on these topics may prove relevant and, in fact, essential to Crowe's repleaded CCPA claim.

## V. Conclusion

For all of these reasons, we make the rule to show cause absolute and remand the case to the trial court for further proceedings, including reconsideration of the protective order, consistent with this opinion.

---

12. While we decline to adopt the *Demopolis* test, it is still instructive in its suggestion of the sort of conduct that may be covered by our consumer protection act. Most viable CCPA claims made against attorneys will involve entrepreneurial activities such as "how the price of legal services is determined, billed, and collected and the way a law firm obtains, retains, and dismisses clients" because these are the areas in which attorneys most often have an effect on the consuming public as a whole. *Demopolis*, 691 P.2d at 168.