20CA1692 Colorado v Center for Excellence 12-24-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 20CA1692
City and County of Denver District Court No. 14CV34530
Honorable Ross B.H. Buchanan, Judge
Honorable Andrew J. Luxen, Judge

---

State of Colorado, ex rel.; Philip J. Weiser, as Attorney General of the State of Colorado; and Martha Fulford, as Administrator of the Uniform Consumer Credit Code,

Plaintiffs-Appellees and Cross-Appellants,

v.

Center for Excellence in Higher Education, Inc., a not-for-profit company; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc., divisions thereof d/b/a CollegeAmerica; Stevens-Henager College, Inc., a division thereof d/b/a Stevens-Henagar College; CollegeAmerica Services, Inc., a division thereof; Carl Barney, Chairman of Center for Excellence in Higher Education, Inc., and Trustee of the Carl Barney Living Trust; The Carl Barney Living Trust; and Eric Juhlin, Chief Executive Officer of Center for Excellence in Higher Education, Inc.,

Defendants-Appellants and Cross-Appellees.

---

JUDGMENTS AFFIRMED

Division A
Opinion by JUDGE BERNARD*
Román, C.J., and Tow, J., concur

Prior Opinion Announced August 26, 2021, Affirmed in Part and
Reversed in Part in 21SC781

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 24, 2025

Philip J. Weiser, Attorney General, Shannon Stevenson, Solicitor General, Russell D. Johnson, Deputy Solicitor General, Brady J. Grassmeyer, Senior Assistant Attorney General, Hanah M. Harris, Senior Assistant Attorney General, Sarah Donahue, Assistant Attorney General II, Denver, Colorado, for Plaintiffs-Appellees and Cross-Appellants

Connelly Law LLC, Sean Connelly, Denver, Colorado, for Defendants-Appellants and Cross-Appellees

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     In late 2014, Colorado's Attorney General and the Administrator of the Uniform Consumer Credit Code, whom we shall collectively refer to as "the Attorney General," sued corporate entities, individuals, and a living trust that ran CollegeAmerica, a for-profit educational operation.  (CollegeAmerica had a presence in other states as well as in Colorado, but all CollegeAmerica campuses are now permanently closed.)

¶ 2     The corporate defendants were the Center for Excellence in Higher Education, Inc., and its divisions: CollegeAmerica Denver, Inc., and CollegeAmerica Arizona, Inc., d/b/a CollegeAmerica; Stevens-Henager College, Inc., d/b/a Stevens-Henager College; and CollegeAmerica Services, Inc.  The individual defendants were Carl Barney and Eric Juhlin.  The living trust was the Carl Barney Living Trust.  We shall refer to the defendants collectively as "CollegeAmerica" unless we need to identify them individually.

¶ 3     After a bench trial, the trial court entered judgment in the Attorney General's favor.  CollegeAmerica and the Attorney General appealed.

¶ 4     A division of this court affirmed the judgment in part, reversed it in part, and remanded the case to the trial court for further

proceedings. *State ex rel. Weiser v. Ctr. for Excellence in Higher Educ., Inc.*, 2021 COA 117 (*Center for Excellence I*). Our supreme court partially reversed the division. *State ex rel. Weiser v. Ctr. for Excellence in Higher Educ., Inc.*, 2023 CO 23 (*Center for Excellence II*).

¶ 5 After reviewing *Center for Excellence II*, we remanded the case for further proceedings and, after those proceedings, recertified the case to this court. We now affirm the trial court's and the remand court's judgments.

## I. Background

¶ 6 The Attorney General alleged CollegeAmerica violated the Colorado Consumer Protection Act, often called the CCPA, which we shall shorten to "the Consumer Act," and Colorado's Uniform Consumer Credit Code, often called the UCCC, which we will call "the Credit Code." In particular, the Attorney General alleged CollegeAmerica

- "knowingly made false representations as to the state governmental approval necessary to offer various degrees and certifications," in violation of section 6-1-105(1)(b), C.R.S. 2014;

2

- "knowingly misrepresented the outcomes and benefits of certain or all of [its] degree programs; the characteristics and benefits of its loans and scholarships; and the sponsorship, approval[,] or affiliation necessary to offer certain degree programs and certifications," in violation of section 6-1-105(1)(e);
- "knew or should have known that [it had] misrepresented the outcomes, value[,] and quality of [its] various degree programs," in violation of section 6-1-105(1)(g);
- engaged in "bait and switch" advertising, in violation of section 6-1-105(1)(n)(I), (II);
- did not disclose material information with the intent to induce consumers to enroll as students, in violation of section 6-1-105(1)(u);
- "failed to obtain the necessary authorization to offer certain degree programs," in violation of section 6-1-105(1)(z); and

- engaged in fraudulent or unconscionable conduct in inducing consumers to enter into loans, in violation of the Credit Code, § 5-6-112, C.R.S. 2025.

¶ 7 As is pertinent to this appeal, the trial court dismissed part of the bait-and-switch claim, it made a pretrial ruling that the Attorney General would not be required to prove 'significant public impact' to prevail on its Consumer Act claims, and it then held a four-week bench trial beginning in 2017. The Attorney General filed a proposed order.

¶ 8 In 2020, the trial court issued its written order and judgment, deciding that all named defendants were jointly and severally liable for violating the Consumer Act. It ordered them to pay $3 million in civil penalties, and it issued detailed injunctions against CollegeAmerica under both the Consumer Act and the Credit Code. More specifically, the trial court, as is relevant to our analysis, decided CollegeAmerica had violated the Consumer Act in six ways:

1) Claim One — making false or misleading representations about the graduates' expected earnings;

2) Claim Two — making false or misleading representations about the graduates' job placement rates;

4

3) Claim Three — making false or misleading representations that the EduPlan made college affordable, though it also found the EduPlan was not unconscionable;

4) Claim Four — knowingly misrepresenting the characteristics, uses, and benefits of CollegeAmerica's x-ray training within the medical specialties curriculum to become a limited scope operator, which we will shorten to "LSO";

5) Claim Five — knowingly making false and misleading representations that CollegeAmerica's medical specialties program offered training to become an emergency medical technician, which we will shorten to "EMT," to prepare for certification to be an EMT in Colorado; and

6) Claim Six — knowingly making false representations from 2010 to 2014 about the availability of a sonography degree program at the Denver campus.

¶ 9 CollegeAmerica and the Attorney General appealed.

¶ 10 The corporate defendants contended that the trial court erred when it (1) retroactively applied a 2019 amendment to the Consumer Act, which eliminated the Attorney General's obligation

5

to prove "significant public impact"; (2) deprived them of their right to a jury trial; (3) allowed the Attorney General to pursue what was essentially a claim for educational malpractice; (4) held the corporate defendants liable for conduct that federal regulations required, thus substituting its own policy judgments for those of the federal regulators; (5) decided all the Consumer Act claims against them; and (6) deprived them of their right to a fair process because its ruling was long delayed and it incorporated much of the Attorney General's proposed order.

¶ 11 The individual defendants and the living trust asserted the trial court erred when it (1) did not require the Attorney General to prove significant public impact under the Consumer Act; (2) denied them the right to a jury trial; (3) found Barney and Juhlin personally liable when the evidence presented at trial did not support the imposition of personal liability against either; and (4) imposed liability against the living trust under an alter ego theory.

¶ 12 The Attorney General raised one error: The trial court should have concluded, as a matter of law, that CollegeAmerica's entire EduPlan loan program, through which CollegeAmerica loaned students money to pay for their educations, was unconscionable.

6

¶ 13      In August 2021, a division of this court decided *Center for*

*Excellence I.*  Specifically, it concluded

- it would reverse the trial court's judgment and remand

  the case for a new trial on the Consumer Act claims

  because the trial court had erred when it decided the

  Attorney General did not need to prove a significant

  public impact under the Consumer Act, *Center for*

  *Excellence I*, ¶¶ 54-46;

- CollegeAmerica did not have a right to a jury trial, *id.* at

  ¶ 71;

- the Attorney General's Consumer Act claims were not

  barred by the educational malpractice doctrine, *id.* at

  ¶ 81;

- CollegeAmerica's use of national wage data in its

  advertisements did not shield it from liability, *id.* at ¶ 89;

- the Attorney General did not have to prove all

  CollegeAmerica's EduPlan loans to students were

  unconscionable, *id.* at ¶ 112; and

7

- the case had to be assigned to a different judge on remand because of the court's long delay in reaching a decision, *id.* at ¶ 120.

¶ 14 In May 2023, our supreme court partially reversed the division in *Center for Excellence II.* The court held it could not "say, on the record before [the court], that a new trial on all" the Attorney General's Consumer Act claims was "necessarily warranted." *Center for Excellence II*, ¶ 66. (The Attorney General did not challenge the division's holding that proof of significant public impact was required.) The supreme court therefore remanded the case to this court "to determine whether CollegeAmerica had a full and fair opportunity to litigate the significant public impact element." *Id.*

¶ 15 The supreme court recognized "a limited remand to the trial court may be necessary to make additional findings." *Id.* If the division were to conclude CollegeAmerica had a full and fair opportunity to litigate the significant public impact element, the supreme court instructed the division to decide (1) "whether the evidence presented at trial was sufficient to establish significant public impact," and, if so, whether the trial court's error in not

8

making this finding was harmless, *id.* at ¶ 67; and (2) "any remaining arguments" concerning the Attorney General's Consumer Act claims "the division did not consider because of its decision to remand the claims for a new trial," *id.*

¶ 16     The supreme court also decided CollegeAmerica was not entitled to a jury trial and, although the division erred in its rationale, the division "properly affirmed the trial court's finding that the EduPlan loans as a whole were not unconscionable." *Id.* at ¶ 69.

¶ 17     In response to the supreme court's opinion, the division ordered the parties to provide supplemental briefs answering four questions.

¶ 18     The first question was whether the trial court's pretrial ruling on significant public impact "so undermine[d] the parties' incentives to litigate the significant public impact issue that a new trial is necessarily required," or whether "the parties [had] a full and fair opportunity to litigate the merits of the significant public impact issue."

¶ 19     The second question was, if "the parties had a full and fair opportunity to litigate the significant public impact issue," (a)

whether "the evidence submitted at trial [was] sufficient to establish significant public impact"; (b) whether "the [trial court's] error in not making findings about significant public impact [was] harmless"; and (c) "[w]hat additional claims under the [Consumer Act]" that the division did not address in its opinion because of its decision to remand the case for a new trial it should consider now.

¶ 20    The third question was, "if CollegeAmerica did not have a full and fair opportunity to litigate the merits of the significant public impact issue," what the scope of a remand to the trial court should be "to achieve substantial justice for the parties" under C.R.C.P. 61 that "could potentially require less than an entirely new trial" on the Consumer Act claims.

¶ 21    The fourth question was whether a remand to the trial court was necessary for the trial court to make factual findings concerning the first three questions, and, if so, which ones.

¶ 22    After reviewing the supplemental briefs and their answers to the four questions, the division remanded the case to the trial court.  (Because a new district court judge had taken over this case, we shall refer to that judge as "the remand court.")  The order was limited in scope: It instructed the remand court to decide whether

10

CollegeAmerica "had a full and fair opportunity" to litigate whether its conduct had a significant public impact. To do so, the court "should make inquiries and conduct further proceedings as it deems necessary."

¶ 23 If the court decided CollegeAmerica had a full and fair opportunity to litigate the significant public impact issue, then it was to "enter factual findings and legal conclusions" concerning that issue. If the court decided CollegeAmerica did not have a full and fair opportunity to litigate the significant public impact issue, then it was to take steps to allow CollegeAmerica to "fully litigate" the significant public impact issue and to enter factual findings and legal conclusions based on the additional litigation.

¶ 24 The remand court completed these tasks, and it issued a written order on February 5, 2025. Although we will discuss this order in detail below, we provide a preliminary summary now.

¶ 25 The remand court decided CollegeAmerica did not have a full and fair opportunity to litigate the issue of significant public impact during the trial, so it offered the parties a chance to present additional evidence on that issue. In response, the parties told the court they had no additional evidence to offer, and they wished to

present argument to the court on the significant public impact issue based on the existing record. After listening to those arguments, the court issued its order. In it, the court ruled the Attorney General had proved a significant public impact on all the Consumer Act claims.

¶ 26 The case was recertified to this court. The parties submitted supplemental briefs to this division on the significant public impact issue.

¶ 27 We begin by addressing the significant public impact issue. We next address the issues the division did not discuss in *Center for Excellence I*, including the claims against the individual defendants and the living trust.

## II. Standard of Review

¶ 28 During the proceedings before the remand court, the parties disagreed about whether that court should give any deference to the trial court's factual findings. CollegeAmerica asserted that there should be no deference; the Attorney General said there should be deference; and the trial court agreed with the Attorney General. That disagreement continues in this appeal.

¶ 29   CollegeAmerica contends that the trial court's delay in issuing its judgment, combined with adopting nearly all the Attorney General's proposed factual findings, rendered the earlier proceedings fundamentally unfair.  CollegeAmerica thus asserts that we should not defer to the trial court's factual findings.  We disagree.

¶ 30   To be sure, because the trial court adopted the Attorney General's proposed findings nearly verbatim, we will scrutinize those findings "more critically than if they were produced by the trial court itself."  *Trask v. Nozisko*, 134 P.3d 544, 549 (Colo. App. 2006).  But that does not mean we review the record de novo to arrive at our own factual findings; rather, "we will sustain those findings if they are supported by the evidence."  *Ficor, Inc. v. McHugh*, 639 P.2d 385, 390 (Colo. 1982).  We will assume the trial court "examined the proposed findings and agreed that they correctly stated the facts as [the court itself] found them to be; otherwise, [the court] would not have adopted them as [its] own."  *Uptime Corp. v. Colo. Rsch. Corp.*, 420 P.2d 232, 235 (Colo. 1966).  "It is only when the findings themselves are inadequate and do not

13

indicate the basis for the . . . court's decision that the judgment will be reversed." *Id.*

¶ 31　There has been a lot of water under the bridge since the proceedings before the trial court that undermines CollegeAmerica's contention that those proceedings were unfair.

¶ 32　First, the remand court "independently reviewed the relevant evidence" and based its findings "upon careful examination of the complete trial record, weighing the evidence accordingly."

¶ 33　Second, the division in *Center for Excellence I,* ¶ 120, decided the record did *not* show the trial court harbored a bias against CollegeAmerica.　It ordered a new judge to handle the case on remand because of the trial court's significant delay in issuing its order.

¶ 34　So, to the extent we review the remand court's factual findings that were, in turn, based on the trial court's factual findings, we will review them for clear error.　*See Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC,* 2020 COA 34, ¶ 24 ("We review findings of fact for clear error, meaning that we won't disturb such findings if there is any evidence in the record supporting them."), *aff'd,* 2021 CO 56. To the extent we review the trial court's factual findings that were

14

not revisited by the remand court, we will review them to see whether they are "inadequate and do not indicate the basis for the . . . court's decision," *Uptime Corp.*, 420 P.2d at 235, and we will sustain those findings if they are supported by the evidence, *see Ficor*, 639 P.2d at 390.

¶ 35 We review de novo the trial court's and the remand court's applications of the law. *Crocker v. Greater Colo. Anesthesia, P.C.*, 2018 COA 33, ¶ 15.

¶ 36 We now turn to the issue of whether CollegeAmerica had a full and fair opportunity to litigate the significant public impact issue.

### III. Significant Public Impact

#### A. Applicable Law

¶ 37 The Consumer Act is a remedial statute intended to deter and to punish deceptive trade practices committed by businesses when dealing with the public. *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 50-51 (Colo. 2001). Its broad legislative purpose is "to provide prompt, economical, and readily available remedies against consumer fraud." *W. Food Plan, Inc. v. Dist. Ct.*, 598 P.2d 1038, 1041 (Colo. 1979). It provides two enforcement avenues: a private action brought by any person against a business or a public

action brought by the Attorney General against the business. *Showpiece Homes Corp.*, 38 P.3d at 51.

¶ 38　When this case was brought in 2014, to prove a private right of action under the Consumer Act, a plaintiff had to show (1) the defendant engaged in an unfair or a deceptive trade practice; (2) the challenged practice occurred in the course of the defendant's business, vocation, or occupation: (3) the challenged practice significantly impacted the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury. *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998).

¶ 39　To establish a public right of action, however, the Attorney General only had to prove the first three elements to assess civil penalties. *State ex rel. Weiser v. Castle L. Grp., LLC*, 2019 COA 49, ¶ 108, *superseded by statute*, Ch. 268, sec. 1, § 6-1-103, 2019 Colo. Sess. Laws  2515.  (We recognize the legislature amended the Consumer Act in 2019 to eliminate the significant public impact element for public rights of action brought by the Attorney General. But this change was not retroactive, so significant public impact

remains an issue in this case. *See Center for Excellence I*, ¶¶ 52, 54.)

¶ 40 "[T]he question whether there is a significant public impact" in a Consumer Act case "is one of fact." *One Creative Place, LLC v. Jet Ctr. Partners, LLC*, 259 P.3d 1287, 1289 (Colo. App. 2011).

¶ 41 In evaluating the public impact of a defendant's allegedly deceptive trade practice, courts must consider, at least, (1) the number of consumers directly affected by the trade practice; (2) the relative sophistication and bargaining power of the consumers affected by the practice; and (3) evidence the practice previously impacted other consumers or had significant potential to do so in the future. *Martinez v. Lewis*, 969 P.2d 213, 222 (Colo. 1998). But this list is not exhaustive, and no single factor is determinative. *See id.* (identifying "[s]ome of the considerations relevant to" a determination of public impact); *Crowe v. Tull*, 126 P.3d 196, 208 (Colo. 2006)("at least three factors to consider"); *Shekarchian v. Maxx Auto Recovery, Inc.*, 2019 COA 60, ¶ 42 (noting "[n]o single factor is determinative").

## B.    Analysis

### 1.    Evidence Supports the Remand Court's Determination There Was Significant Public Impact

¶ 42    Under the factors outlined in *Martinez*, 969 P.2d at 222, we conclude the evidence presented at trial supports the remand court's finding of significant public impact for all six claims.

¶ 43    CollegeAmerica's marketing and advertising directly affected the public because they were directed at the general market.  For example, CollegeAmerica utilized national average wage data showing wages significantly higher than those earned by CollegeAmerica's graduates.  The national data was used as part of its admissions interview process, which was viewed by more than 10,000 students who enrolled in CollegeAmerica since 2006.

¶ 44    CollegeAmerica was aware this information was essential to prospective students, and its admissions employees emphasized to prospective students the high wages they could receive based on the national data.

¶ 45    CollegeAmerica distributed the national data in extensive advertising campaigns.  Between 2010 and 2015, it conducted approximately seventy-five mail campaigns, some of which reached

18

between 13,000-14,000 Colorado homes. *See Hall*, 969 P.2d at 235 ("[T]here is no dispute that [defendants'] deceptive practices implicated the public as consumers because the misrepresentations were directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers.").

¶ 46    The evidence presented at trial also showed there was a significant disparity in the relative bargaining positions of CollegeAmerica and the affected students.

¶ 47    The Consumer Act protects consumers who are in a relatively weak bargaining position, particularly in situations where consumers are dependent on a defendant for truthful information about a transaction. *See Martinez*, 969 P.2d at 222.

¶ 48    Unlike CollegeAmerica, which was a large corporate entity, CollegeAmerica's students were often relatively economically unsophisticated. *See Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003)(recognizing that "a large company is generally more sophisticated than individual consumers"). As a result, students were in a significantly weaker bargaining position regarding CollegeAmerica's use of the national

19

data. CollegeAmerica, through the testimony of Eric Juhlin, admitted its students generally had "been dealt a very challenging hand."

¶ 49    CollegeAmerica was also in a substantially stronger bargaining position relative to its students concerning information about its graduate placement rates because it knew high employment rates in students' chosen fields of study were a significant factor in prospective students' decisions to enroll.

¶ 50    CollegeAmerica was also aware that wage information was material to the students' decision to enroll in the school. But they did not have a viable alternative means of ascertaining the truthfulness of CollegeAmerica's wage data, so they were dependent on CollegeAmerica's representations. *See Martinez*, 969 P.2d at 222 (noting the Consumer Act protects consumers who are in a relatively weak bargaining position, particularly where consumers are dependent on the defendant for access to truthful information regarding the transaction).

¶ 51    CollegeAmerica conducted about forty mailing campaigns to the public that included misleading information about the EduPlan, and it displayed the same misleading information on its website. It

also provided this misleading information to students during the admissions interview process.

¶ 52    CollegeAmerica was aware many students could not afford tuition without the EduPlan. It also knew high numbers of its students and graduates defaulted on their loan obligations. Evidence at trial showed that between 2003 and 2006, approximately 70% of EduPlan borrowers defaulted on their payments. Between 2010 and 2016, more than 80% of students were assessed late fees on their loans.

¶ 53    Despite knowing that many of its students were experiencing financial distress and were unable to afford their EduPlan payments, CollegeAmerica continued to advertise the EduPlan to make college affordable. Indeed, CollegeAmerica trained its employees to minimize students' concerns about the EduPlan, and employees spent only "a minute or two" reviewing the monthly payment plan and whether students could afford it.

¶ 54    From 2008 to 2011, CollegeAmerica widely advertised that its medical specialties program would prepare students for the LSO exam in television advertisements, internet marketing, print advertisements, and admissions binders. This information was

21

reiterated in CollegeAmerica's course catalog. CollegeAmerica specifically utilized "key word marketing" to target prospective students who were interested in x-ray training.

¶ 55 However, CollegeAmerica's Colorado campuses did not have the necessary x-ray equipment and did not provide enough experiential training for the LSO certification. Five students enrolled in CollegeAmerica based on its representations regarding the LSO certification.

¶ 56 CollegeAmerica never offered EMT courses as part of its programming at any of its Colorado locations. Despite this fact, CollegeAmerica advertised EMT certification to the general Colorado market in printed advertising, in its course catalog, in admissions binders, in admissions interviews, and online.

¶ 57 Several CollegeAmerica students testified at trial. They said the admissions employees told the students during the admissions interview they would be able to obtain EMT certification after completing the medical specialties program and taking the state examination. Based upon these representations, the students said they decided to enroll in CollegeAmerica. CollegeAmerica also received survey results as early as 2008 from its accrediting

22

institution putting it on notice that students were enrolling in the medical specialties program based on their understanding the program would lead to the EMT certification.

¶ 58    Yet CollegeAmerica continued to list EMT as a possible certification for the medical specialties program in its admissions binder through 2009 and on its Colorado-specific website through most of 2010.  It continued to advertise the EMT certification in materials distributed throughout Colorado, and its employees continued to mislead prospective students by making repeated representations that EMT certification was possible through CollegeAmerica's programming when it was not.

¶ 59    CollegeAmerica's conduct directly affected the public by informing students about its sonography program through meetings and admissions interviews, as well as by including the program in its course catalog.  In 2010, following the closure of Mile High Medical Academy, CollegeAmerica held a meeting at which it informed prospective students that it would create a sonography program the following year.  Several students testified about how admissions personnel told them during their admissions interviews there would be a sonography program at CollegeAmerica, and they

should enroll in the health administration program because those classes would correspond with the sonography program. The students added they would not have enrolled in CollegeAmerica had they known there was a possibility it was not going to offer a sonography program.

¶ 60 In early 2012, CollegeAmerica began advertising the sonography program in its catalogs. Over the next year, it received multiple inquiries from prospective students about the availability of the sonography program, prompting the Dean of Education for its Fort Collins campus to remark, "We have inquiries frequently [about the sonography program], but can't offer it and I find that a little unsettling with potential students. They all follow-up with well why does it say you have it in the catalog?"

¶ 61 CollegeAmerica decided not to offer the sonography program at its Colorado campuses, but it continued to list the program in its course catalog for a while after it had made this decision.

### 2. CollegeAmerica's Additional Contentions About Significant Public Impact

¶ 62 CollegeAmerica further contends that (1) the remand court misapplied the law because "directly affected" requires evidence

24

that CollegeAmerica's advertising caused harm to an actual consumer; (2) neither CollegeAmerica's challenged advertisements nor its catalog listings directly affected any consumer; (3) there was no other basis for finding significant public impact; and (4) the factual findings and conclusions adopted by the trial court and the remand court are incorrect. We are not persuaded.

### a. Directly Affected

¶ 63 CollegeAmerica contends that the remand court misapplied the law because the phrase "directly affected" requires evidence showing actual consumers were misled by the allegedly deceptive advertising. It claims there was no evidence establishing the allegedly deceptive advertising caused injury to an actual consumer.

¶ 64 We reject CollegeAmerica's position because it would limit the Consumer Act's efficacy in fulfilling its purpose. As we noted above, the Consumer Act is a remedial statute intended to deter and to punish deceptive trade practices committed by businesses when dealing with the public. *Showpiece Homes Corp.*, 38 P.3d at 50-51. The Consumer Act's broad legislative purpose is to provide prompt, economical, and readily available remedies against consumer fraud. *Id.* at 51 (citing *W. Food Plan Inc.*, 598 P.2d at 1041).

25

¶ 65 The Consumer Act also regulates "commercial activities and practices which, 'because of their nature, may prove injurious, offensive, or dangerous to the public.'" *Rhino Linings*, 62 P.3d at 146 (quoting *People ex rel. Dunbar v. Gym of Am., Inc.*, 493 P.2d 660, 667 (Colo. 1972)). When interpreting the Consumer Act's language, courts rely on the Consumer Act's broad deterrent purpose and scope. *Id.* "An expansive approach is taken in interpreting the [Consumer Act] by reading and considering the [Consumer Act] in its entirety and interpreting the meaning of any one section by considering the overall legislative purpose." *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 973 n.10 (Colo. 1993); *see also Showpiece Homes Corp.*, 38 P.3d at 51 ("[W]e must keep in mind the liberal construction we have given the [Consumer Act] in prior cases."). Adopting CollegeAmerica's definition of "directly affected" would drastically narrow the scope of conduct covered by the Consumer Act — a result at odds with the preceding authority directing us to interpret the statute broadly.

¶ 66 CollegeAmerica's position would require the Attorney General to show evidence of specific individuals who have suffered an actual injury before the Attorney General could file a Consumer Act claim.

26

But neither the Consumer Act nor our case law requires evidence of an actual injury before the Attorney General can seek civil penalties. *See May Dep't Stores Co.*, 863 P.2d at 973 (noting that the Consumer Act "*does not require proof of an actual injury or loss before a civil penalty can be awarded*" (emphasis added)).

¶ 67 We must also consider the Consumer Act's deterrent purpose when analyzing the scope of the statute. *See Rhino Linings*, 62 P.3d at 146. Requiring proof of actual injury to a consumer before a Consumer Act claim can be brought would force the Attorney General to wait on the sidelines for consumers to become victims before the Attorney General could act. *May Dep't Stores Co.*, 863 P.2d at 973 n.9 ("A policy of tolerating false advertising until a customer was actually injured would . . . ignore the plain language and broad remedial purposes of the [Consumer Act].").

¶ 68 CollegeAmerica's contention also conflates the elements of a private Consumer Act claim with the elements required for public claims brought by the Attorney General. As we explained above, *Hall*, 969 P.2d at 235-36, listed five elements for private Consumer Act claims, versus three for public Consumer Act claims filed by the Attorney General. *See also Castle L. Grp.*, ¶ 108. In other words,

the proof requirements for the Attorney General, in this context, are not the same as the proof required for private Consumer Act claims.

### b. Advertisements and Catalog Listings

¶ 69     CollegeAmerica asserts that neither the challenged advertisements nor the catalog listings directly affected consumers. Specifically, it submits that (1) the Attorney General did not offer evidence showing any student misunderstood the national wage data; (2) the Attorney General did not offer evidence that any student reviewed or acted on the graduation/employment data; (3) the Attorney General did not introduce any evidence of any student who was misled or acted upon the EduPlan flyers; and (4) the number of students directly impacted by the LSO, EMT, and sonography claims were numerically insufficient to establish significant public impact.  We disagree.

¶ 70     CollegeAmerica's position about its advertising is predicated on the assumption that "directly affected" requires an identifiable consumer to suffer an actual injury.  But, as we have shown, neither the Consumer Act nor our case law imposes such a requirement.

¶ 71    "Although 'the number of consumers directly affected by' a deceptive trade practice is one factor that may be considered in evaluating public impact, no single factor is determinative, nor does *Martinez* suggest that it provides an exhaustive list."  *One Creative Place, LLC*, 259 P.3d at 1290 (citation omitted).

¶ 72    Based on the record in this case, there can be no meaningful dispute that CollegeAmerica's "deceptive practices implicated the public as consumers because the misrepresentations were directed to the market generally, taking the form of widespread advertisement and deception of *actual and prospective* purchasers." *Hall*, 969 P.2d at 235 (emphasis added).  And the evidence in this case showed that the LSO, EMT, and sonography programs were marketed broadly to the public.  *See Shekarchian*, ¶ 49 ("[T]he evidence supported a reasonable inference that Maxx Auto engages in the unfair or deceptive trade practice in virtually every interaction with consumers.").

¶ 73    Turning to the specific evidence about students in the record, when discussing significant public impact under Claim One — concerning wage data — the remand court found that

- "[b]etween 60% and 66%" of the students who enrolled in CollegeAmerica "did not graduate";

- of those who graduated, "about 20% to 25% were unemployed";

- graduates "often ended up with low-paying jobs outside their fields of study and stuck with high levels of educational debt that they were unable to repay"; and

- "multiple" students testified that they "enrolled at CollegeAmerica because of its misleading practices and were unable to find employment or obtain better paying jobs after graduation."

¶ 74    As for significant public impact for Claim Two — job placement rates — the remand court found that

- "approximately 326 out of 925 CollegeAmerica graduates were incorrectly reported as 'employed in the field;" and

- several graduates testified they were "either unemployed or working in unrelated fields."

¶ 75    Turning to significant public impact for Claim Three — the EduPlan — the remand court found that

- "CollegeAmerica's representations impacted many hundreds of Colorado consumers who borrowed money through the EduPlan loans";

- CollegeAmerica "sent over . . . 1,400 . . . EduPlan borrowers to collections agencies";

- a significant percentage of students who defaulted on their EduPlan loans faced harsh economic consequences, "such as negative credit reporting, difficulty qualifying for other loans, falling behind on other credit obligations, missing rent and utility payments, and [having] less money to support themselves and their families"; and

- these debts were generally not dischargeable in bankruptcy, meaning students would be saddled with the negative consequences of the EduPlan loans well into the future.

¶ 76    For Claim Four — LSO — the remand court found that at least five students "enrolled in CollegeAmerica because of [its] false statements."

¶ 77    The remand court found that, for Claim Five — EMT certification — at least two "former students testified that they were

31

misled by CollegeAmerica . . . during their admission interviews . . . which resulted in significant financial harm."

¶ 78 And, for Count Six — the sonography program — the remand court found that "at least two" students testified they were "harmed by CollegeAmerica's representations about the availability of a sonography program."

¶ 79 CollegeAmerica's submission concerning the catalog listings, while slightly different, is equally unpersuasive. It submits that the Attorney General's LSO, EMT, and sonography claims do not establish significant public impact because deceptive advertising "at most allegedly affected eight out of the 10,879 students who enrolled from 2006 to 2016." There is, CollegeAmerica continues, an implicit numerical threshold — a specific number of actual consumers suffering injury — that the Attorney General must show before the Attorney General can establish significant public impact.

¶ 80 But this position misunderstands our precedent. CollegeAmerica relies heavily on cases where courts concluded that plaintiffs had not established significant public impact, in part, because of the small number of individuals directly affected by the deceptive advertising. *See, e.g., Coors v. Sec. Life of Denver Ins. Co.,*

32

91 P.3d 393, 399 (Colo. App. 2003)(noting impact of "200 affected policy holders out of 20,000" did not constitute significant public impact), *aff'd by an equally divided court in part and rev'd in part,* 112 P.3d 59, 63-64 (Colo. 2005); *Rhino Linings*, 62 P.3d at 150 ("Three affected dealers out of approximately 550 worldwide does not significantly affect the public . . . .").

¶ 81    But these statements taken in isolation and stripped of their context do not fairly represent the nuanced approach taken by our courts when balancing the factors listed in *Martinez*, 969 P.2d at 222.  Specifically, CollegeAmerica relies on *Coors* and *Rhino Linings* to contend that, for Claims Four, Five, and Six, the small number of affected students — five for LSO, two for EMT, and two for sonography — means there was not a significant public impact for those claims.  *See Coors*, 91 P.3d at 399 (finding no significant public impact in part due to the "challenged conduct being private in nature," and fact that Coors was "a sophisticated businessman and was accompanied by counsel"); *Rhino Linings*, 62 P.3d at 150 (finding no significant public impact, in part because the claim was more akin to a private breach of contract, and "Snyder was represented by counsel in negotiations with Rhino and Schaefer

33

was relatively sophisticated in his education and knowledge of the business").

¶ 82     But both *Coors* and *Rhino Linings* were *private* causes of action, not public causes of action, such as this case, brought by the Attorney General.  *See Coors*, 91 P.3d at 398; *Rhino Linings*, 62 P.3d at 146.

c.  CollegeAmerica's Claim that No Other Basis Supports Significant Public Impact

¶ 83     CollegeAmerica contends that there is no other basis for finding significant public impact because neither the second nor third *Martinez* factor is applicable.

¶ 84     According to CollegeAmerica, the second factor — the "relative sophistication and bargaining power of the consumers affected by the challenged practice," *Martinez*, 969 P.2d at 222 — does not apply because few to no consumers were harmed by CollegeAmerica's conduct.  Likewise, CollegeAmerica asserts that the third factor is inapplicable because its discontinued past practices cannot impact future consumers.  (As we noted above, CollegeAmerica ceased operations in Colorado in 2020.)  Again, we disagree.

¶ 85    CollegeAmerica's assertion that the second *Martinez* factor is inapplicable if no or few consumers are directly affected is not supported by precedent.  Its assertion implies the term "directly affected" is either a threshold question to be answered before proceeding to the remaining *Martinez* factors or a recognition the first *Martinez* factor is determinative.  But our case law has not adopted such a rigid analysis, and we decline to do so here.  *See id.*

¶ 86    Second, even assuming, for the purposes of argument, the closure of CollegeAmerica's operation in Colorado limits the extent to which the college's past actions could produce future harms, it does not alter our analysis or the significance of the other factors.  And, despite the fact the closure may eliminate some aspects of the future harm caused by CollegeAmerica's conduct, we are unpersuaded its closure eliminates the impact its past conduct had on its students.

### d.  Reliability of the Trial Court's Factual Findings

¶ 87    CollegeAmerica next attacks the trial court's factual findings and conclusions as unreliable.  As we concluded above, to the extent we review the trial court's factual findings that were not revisited by the remand court, we look at them to see whether they

are "inadequate and do not indicate the basis for the . . . court's decision," *Uptime Corp.*, 420 P.2d at 235, and we will sustain those findings if they are supported by the evidence, *see Ficor*, 639 P.2d at 390. In this case, we conclude they were supported by evidence.

## IV. Bias and Fairness of the Trial Court Proceedings

¶ 88    In its supplemental briefing following the remand, CollegeAmerica reasserts its beliefs that (1) the proceedings were fundamentally unfair; and (2) the Attorney General and the trial court were biased against proprietary colleges. These claims, however, were considered and addressed in *Center for Excellence I*, ¶ 120. We decline to reconsider these claims. *See In re Foster*, 253 P.3d 1244, 1258 (Colo. 2011)(rejecting a claim of bias because it "simply asserted the same arguments to the same court for a second time" and it was "not a situation where new circumstances or new evidence could possibly have led to a different result").

## V. CollegeAmerica's Remaining Claims Concerning the Consumer Act

¶ 89    CollegeAmerica raises an assortment of other alleged errors regarding the Consumer Act.

## A. CollegeAmerica's Universal Challenges

¶ 90    As we understand its position, CollegeAmerica asserts that (1) the Attorney General's Consumer Act claims constitute a qualitative attack on CollegeAmerica's educational services; (2) the trial court usurped the regulatory functions of the Department of Education, the Accrediting Commission of Career Schools and Colleges, and Colorado's Division of Private Occupational Schools; (3) the trial court did not apply the "reasonable consumer" standard for analyzing deceptive conduct; and (4) the trial court did not conduct a "holistic review" of the claims. (It is unclear whether CollegeAmerica raises these challenges to all six of the Attorney General's Consumer Act claims. Out of an abundance of caution, we treat these assertions as applying to all six claims.) We are not persuaded by any of these more general assertions.

### 1. Educational Malpractice

¶ 91    CollegeAmerica submits that the Attorney General's Consumer Act claims are barred by the educational malpractice doctrine because they are qualitative attacks against its educational services. The division's prior opinion rejected CollegeAmerica's submission that the educational malpractice doctrine prohibits

37

Consumer Act claims against educational institutions as a matter of law. *See Center for Excellence I*, ¶ 81. But the division did not address whether the Attorney General's claims were prohibited based on specific facts presented at trial. *Id.* at ¶ 72.

¶ 92 Because education is a "collaborative and subjective process whose success is largely reliant on the student," and because "the existence of such outside factors as a student's attitude and abilities render it impossible to establish any quality or curriculum deficiencies as a proximate cause to any injuries," Colorado courts have refused to recognize claims alleging educational malpractice. *Tolman v. CenCor Career Colls., Inc.*, 851 P.2d 203, 205 (Colo. App. 1992), *aff'd sub nom.*, *CenCor, Inc. v. Tolman*, 868 P.2d 396 (Colo. 1994); *see CenCor*, 868 P.2d at 398 ("Contract claims that in fact attack the general quality of educational experiences provided to students have generally been rejected.").

¶ 93 Notwithstanding this prohibition, a plaintiff may raise claims alleging the institution did not provide educational services the institution promised to provide. *See CenCor*, 868 P.2d at 399 (holding claims based on an institution's lack of "specifically promised educational services" are permitted).

¶ 94    We conclude, for the following reasons, that the Attorney General's Consumer Act claims do not pertain to the quality of the education provided by CollegeAmerica, and they do not question the abilities of its instructors or the wisdom of its curriculum. Instead, the claims focus on specific representations made by CollegeAmerica in its advertising and throughout its admissions process. *See id.* (recognizing the educational malpractice doctrine would not bar claims such as "a failure to offer any classes or a failure to deliver a promised number of hours of instruction" because such claims sound in contract).

¶ 95    For example, the Attorney General presented evidence that CollegeAmerica used national wage data to mislead prospective students into believing they would receive salaries higher than the salaries its graduates were receiving. Similarly, there was proof CollegeAmerica misled prospective students by advertising inflated job placement rates. Neither of these claims implicated how CollegeAmerica presented its educational programming or the quality of its courses. Rather, the claims focused on what its representatives were telling prospective students and the public

about what they might expect to receive after taking CollegeAmerica's classes.

¶ 96     Likewise, the Attorney General's claims about CollegeAmerica's representations for specific programming — such as the LSO, EMT, and sonography programs — do not address the quality of the education provided in those classes. Instead, the evidence focused on representations made in CollegeAmerica's advertising — such as telling students they could pursue a degree in sonography despite not offering a sonography program, or that a student could sit for the LSO licensing exam even though CollegeAmerica's coursework did not meet the exam's minimum qualifications. *See id.* ("[I]f certain requisites necessary to attain certification in a specific program are not even offered, a claim based on contract principles may be viable.").

### 2.     Usurping Regulatory Function

¶ 97     As is pertinent to our analysis, the trial court ordered CollegeAmerica before the trial to disclose in any advertisement using wages obtained from the Bureau of Labor Statistics or from any other national database that the wages were "based upon national data," not on CollegeAmerica's data. Before the trial, the

court also required CollegeAmerica to disclose the "median wages of CollegeAmerica graduates in the prospective students' program(s) of interest." CollegeAmerica contends that this order was error because it usurped the regulatory role of (1) the Department of Education by imposing new affirmative rules on how CollegeAmerica must report wages beyond those rules already mandated by the Department; (2) the Accrediting Commission of Career Schools and Colleges by acting as CollegeAmerica's regulator instead of the Accrediting Commission; and (3) Colorado's Division of Private Occupational Schools by requiring the reporting of college-specific wage data when the Division of Private Occupational Schools did not. We disagree.

¶ 98    The Consumer Act provides a district court may

> make such orders or judgments as may be necessary to prevent the use or employment by the person of any such deceptive trade practice or that may be necessary to completely compensate or restore to the original position of any person injured by means of any such practice or to prevent any unjust enrichment by any person through the use or employment of any deceptive trade practice.

§ 6-1-110(1), C.R.S. 2025.

¶ 99 Under this grant of authority, "[a] trial court enjoys broad discretion in fashioning appropriate remedies under the [Consumer Act]." *People v. Wunder*, 2016 COA 46, ¶ 30 (quoting *People v. Shifrin*, 2014 COA 14, ¶ 83). A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding or application of the law. *Salazar v. Kubic*, 2015 COA 148, ¶ 6.

¶ 100 We conclude, for the following reasons, that the trial court's order did not usurp the authority of the Department, the Accrediting Commission, or the Division of Private Occupational Schools.

¶ 101 Generally, the trial court's orders requiring disclosure of this kind of information were within its discretion under section 6-1-110(1). Colorado appellate courts have consistently recognized court-ordered disclosure of information to consumers is a permissible remedy. *See May Dep't Stores Co.*, 863 P.2d at 978 (noting disclosure is an adequate remedy in some cases); *Castle L. Grp.*, ¶ 28 (acknowledging disclosure may be an adequate remedy to correct fraudulent and misleading advertising practices). In this case, the trial court's order was narrow, only requiring

CollegeAmerica to disclose specific information if it continued to utilize national wage data in its advertising.

¶ 102    More specifically, the trial court's order imposed conditions on CollegeAmerica's use of national wage data in its public advertising. The order did not affect CollegeAmerica's eligibility for federal funding from the Department, its accreditation by the Accrediting Commission, or its license issued by the Division of Private Occupational Schools.

¶ 103    CollegeAmerica points out the Department rescinded a rule in 2019 requiring the reporting of college-specific median earnings. The rescission of this rule, CollegeAmerica continues, is evidence the trial court usurped the Department's authority.

¶ 104    But it is unclear to us why the Department rescinded the rule. The decision to rescind a rule may reflect a variety of considerations, such as its alignment with statutory objectives or its practical implications. *See Colo. Oil & Gas Conservation Comm'n v. Martinez*, 2019 CO 3, ¶¶ 48-53 (pointing out the oil and gas commission's rulemaking decisions may be based on multiple considerations). Absent clear evidence the Department intended the recission of the rule to act as a prohibition on similar

43

requirements in individual cases, which CollegeAmerica did not give the trial court, we decline to interpret the rule's rescission as being designed to preempt other entities from imposing similar requirements.

### 3. Reasonable Consumer Standard

¶ 105    CollegeAmerica asserts that the "reasonable consumer" standard governs whether advertising was deceptive within the context of the Consumer Act. So, it adds, the trial court erred when it did not apply this standard. We disagree.

¶ 106    The Consumer Act defines deceptive trade practices. *See* § 6-1-105(1), C.R.S. 2025 (providing an extensive, nonexhaustive list of conduct that violates the Consumer Act). As is relevant in this case, the trial court decided CollegeAmerica violated section 6-1-105(1)(e), C.R.S. 2014, regarding all six of the Attorney General's claims. (The court also decided some of CollegeAmerica's conduct violated section 6-1-105(1)(g) and (u).)

¶ 107    To establish a deceptive trade practice under section 6-1-105(1)(e), C.R.S. 2014, a plaintiff must show the defendant "[k]nowingly ma[de] a false representation." (Subsection (1)(e) was amended by H.B. 19-1289 to include "recklessly" as a culpable

mental state, but this amendment was not effective when the Attorney General filed this case. Ch. 268, sec. 2, § 6-1-105(1)(e), 2019 Colo. Sess. Laws 2516.)

¶ 108    A false representation is one that "must either induce a party to act, refrain from acting, or have the capacity or tendency to attract consumers." *Rhino Linings*, 62 P.3d at 147. A false representation may satisfy the deceptive trade practice requirement even if the representation did not deceive the plaintiff. *Id.* at 148 (noting the deceptive trade practice requirement can be met by showing the "false representation had *the capacity or tendency to deceive, even if it did not*"(emphasis added)).

¶ 109    We conclude the trial court applied the proper standard under section 6-1-105(1)(e). In reaching its conclusion, the trial court considered whether CollegeAmerica's conduct was deceptive under the framework adopted by our supreme court. *See May Dep't Stores Co.*, 863 P.2d at 973 ("[I]t is in the public interest to invoke the state's police power to prevent the use of *methods* that have a *tendency or capacity* to attract customers through deceptive trade practices."(citation omitted)); *Rhino Linings*, 62 P.3d at 146.

¶ 110   Contrary to CollegeAmerica's assertion, the reasonable consumer standard has not been adopted by either Colorado's legislature or Colorado's courts. The only Colorado authority CollegeAmerica cites for this proposition is a single reference in a case footnote. *See Rhino Linings*, 62 P.3d at 148 n.11. But this footnote does not purport to adopt the reasonable consumer standard as CollegeAmerica submits; rather, the footnote's function is to demonstrate that "courts in other jurisdictions have also concluded that either proof of a misrepresentation or proof that the representation had the capacity to deceive will satisfy the deceptive trade practices requirement." *Id.* at 148.

¶ 111   CollegeAmerica contends that our past reliance on Washington state law requires us to adopt the reasonable consumer standard, which is the standard in that state. *See Crowe v. Tull*, 126 P.3d 196, 203 (Colo. 2006)(noting Colorado courts "have previously looked to decisions of the Supreme Court of Washington for guidance in interpreting the [Consumer Act]."); *see also Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 895 (Wash. 2009)(noting deception exists where the "'representation, omission or practice . . . is likely to mislead' a reasonable consumer" (citation omitted)).

¶ 112   In both *May Department Stores* and *Rhino Linings*, our supreme court articulated the standard for determining whether conduct is deceptive enough to be conduct having "the capacity or tendency to deceive." *Rhino Linings*, 62 P.3d at 148. Adopting the reasonable consumer standard would require us to deviate from the rule prescribed by our supreme court. We decline to do so. *See Silver v. Colo. Cas. Ins. Co.*, 219 P.3d 324, 330 (Colo. App. 2009)("[W]e are not at liberty to disregard that rule absent some clear indication that the Colorado Supreme Court has overruled it."). And, had the supreme court wanted to adopt the reasonable consumer standard, it could have done so in *Rhino Linings*.

¶ 113   To add more weight to the "reasonable consumer" pan on the scale, CollegeAmerica claims in its reply brief that the reasonable consumer standard "now governs not only federal cases but also state consumer protection cases." But it does not cite any Colorado case adopting this standard; it only references authorities from other jurisdictions; and it does not explain how these authorities supplant *May Department Stores* and *Rhino Linings*. And, to the extent this contention was raised for the first time in the reply brief,

we will not consider it further. *See Meadow Homes Dev. Corp. v. Bowens*, 211 P.3d 743, 748 (Colo. App. 2009).

### 4. Holistic Review

¶ 114 CollegeAmerica submits that the trial court erred because it did not conduct a holistic review of the information available to consumers before concluding the advertisements were deceptive. As best we can discern, CollegeAmerica means the trial court did not consider all the evidence presented at trial. But, absent evidence to the contrary, we presume the trial court considered all competent evidence presented during the trial before making its factual findings. *See In re Marriage of Hatton*, 160 P.3d 326, 329-30 (Colo. App. 2007)("We may presume that the trial court considered the evidence before it."); *Hereford v. Benton*, 80 P. 499, 500 (Colo. App. 1905)("We must presume that the court, in making its findings, did its duty; that is, that it considered all competent evidence which had been received in the course of the trial.").

¶ 115 CollegeAmerica asserts that there is evidence, such as its admissions process and its three-week "false start" period, that shows the trial court could not have considered all relevant evidence in concluding that the advertisements were deceptive. But

this evidence — at most — only shows there was conflicting evidence in the record, and the trial court did not find this evidence compelling. In the absence of any specific affirmative evidence to the contrary, we presume the trial court performed its duty and considered the entire record before it. *Marriage of Hatton*, 160 P.3d at 329-30. We therefore will not substitute our judgment for the trial court's. *Gen. Cable Co. v. Indus. Claim Appeals Off.*, 878 P.2d 118, 120 (Colo. App. 1994)("An appellate court does not decide the facts and may not substitute its judgment for that of the fact finder.").

### B. CollegeAmerica's Contentions Regarding Issues Other Than Significant Public Impact

¶ 116 Beyond the significant public impact analysis, CollegeAmerica alleges the trial court committed various errors concerning all six of the Attorney General's Consumer Act claims.

### 1. Claim One: National Wage Data

¶ 117 CollegeAmerica contends that it did not violate the Consumer Act because it truthfully cited national wage data. We disagree.

¶ 118 The division addressed a variant of this issue in *Center for Excellence I*, ¶ 89. It rejected CollegeAmerica's assertion it could

not be held liable for including national wage data in its advertising that the Department required it to disclose. But the division did not address the issue CollegeAmerica raises now, which is based on whether the facts presented to the trial court prohibited the Attorney General's Consumer Act claim.

¶ 119 To begin, the Attorney General did not allege CollegeAmerica violated the Consumer Act because it provided links to accurate national wage data; rather, the Attorney General alleged something decidedly different: CollegeAmerica deceptively used the national wage data in its advertising to mislead consumers. In other words, this allegation focused on the way CollegeAmerica used the national wage data in its advertising, not on the fact the national wage data was accurate.

¶ 120 We conclude, for the following reasons, that the trial court's determination that CollegeAmerica's use of the national wage data in advertising was misleading is supported by the record.

¶ 121 One CollegeAmerica advertisement stated, "[S]tarting offers for graduates with a bachelor's degree in computer science averaged $60,473." In fine print at the bottom of the advertisement, CollegeAmerica noted the information came from the national wage

data and the "actual salary may be higher or lower." But CollegeAmerica knew starting offers for its graduates were markedly lower. Indeed, CollegeAmerica's data showed the average salary for its graduates with a degree in computer science was only $31,870, almost half the salary quoted in its advertisement.

¶ 122    This approach — CollegeAmerica quoting higher national wage data while being aware its data showed its graduates made substantially less than the national figures — was not limited to advertisements concerning CollegeAmerica's computer science degree. CollegeAmerica advertised the median national salary for a degree in accounting as $44,700, even though its data showed the average salary of its graduates was only $27,040. Its catalog listed a starting salary range for a graphic arts degree to be between $38,000 and $45,000, despite its awareness its own data showed graduates made less than $16,000.

¶ 123    We are not persuaded by CollegeAmerica's assertion it cannot be held liable for providing truthful national wage information. A statement, while truthful, may still be misleading when considering the context in which the statement is made. *See NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 11 (Colo. 1994)(noting

a statement appearing to be truthful may still imply a false or misleading fact depending on how it is presented); *Eng v. Specialized Loan Servicing*, 500 P.3d 171, 178 (Wash. Ct. App. 2021)("Even a truthful statement can be deceptive if it creates a misleading 'net impression.'" (quoting *State v. Living Essentials, LLC*, 436 P.3d 857, 865 (Wash. Ct. App. 2019))).

¶ 124   Context matters.  By advertising true statements about the average national wages of certain professions — but declining to provide any of its own data about its graduates' wages — CollegeAmerica misled its students into believing they would receive wages higher than what its graduates received.

### 2.  Claim Two: Graduation and Employment Data

¶ 125   CollegeAmerica submits that the trial court erred when it found that CollegeAmerica's use of graduation and employment data violated the Consumer Act.  Specifically, CollegeAmerica asserts that (1) the trial court should not have applied accreditation rules; (2) the Attorney General's audit misapplied the accreditation rules; (3) the graduation and employment data reported to the Accrediting Commission was never used in CollegeAmerica's advertising; and (4) an independent third party audited and verified

CollegeAmerica's graduation and employment data. We are not persuaded.

¶ 126 We first conclude, for the following reasons, the trial court did not err when it used the relevant accreditation standards.

¶ 127 At trial, the Attorney General offered the testimony of a certified public accountant who had audited CollegeAmerica's employment rate documentation. The accountant was also certified in financial forensics and as a fraud examiner. Based on his review of CollegeAmerica's documentation, the accountant concluded CollegeAmerica was misrepresenting the percentage of graduates who obtained jobs in their fields of study. The court found the accountant's analysis "credible and helpful to understanding the accuracy of CollegeAmerica's reporting of its graduation and employment rates."

¶ 128 Citing *Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools and Colleges*, 781 F.3d 161, 172 (4th Cir. 2015), CollegeAmerica contends that the court's use of this information was improper because courts should not apply accreditation rules in the first instance and because courts lack the knowledge and expertise necessary to perform the Accrediting

53

Commission's function. But *Professional Massage Training Center* is inapposite.

¶ 129 The issue in *Professional Massage Training Center* was a court's decision to overrule the Accrediting Commission's revocation of a school's accreditation. *Id.* at 166. So that case stands for the proposition that courts defer to agency determinations even in the for-profit school accreditation process. *Id.*

¶ 130 But in this case, the trial court was not reviewing any decision of the Accrediting Commission; the court's reliance on the accountant's testimony was not tantamount to a review of any of the Commission's actions; and the court was not asked to defer to any of the Commission's actions. Instead, the court used the accountant's testimony and CollegeAmerica's records to assess the accuracy of the information CollegeAmerica provided to the Commission.

¶ 131 We next reject CollegeAmerica's claims that the accountant misapplied the Accrediting Commission's standards and that a third-party audit absolved CollegeAmerica from liability. CollegeAmerica

- contends that the accountant "defied" the Commission's methodology;

- questions his ability, as a certified public accountant, to apply the Commission's standards accurately; and

- submits that the court did not explain how CollegeAmerica knowingly engaged in a deceptive trade practice when it had reasonably relied on the findings of independent audits.

¶ 132    But these are factual questions, some of them based on credibility findings.  As we have pointed out above, we defer to the trial court's credibility determinations and to its factual findings when they are supported by the record.  *See Shekarchian*, ¶ 28. And the record supports the court's findings as far as these CollegeAmerica assertions are concerned.

¶ 133    For one example, the Accrediting Commission identifies certified public accountants as experts who are qualified to perform independent employment verification audits.

¶ 134    For a second example, the trial court heard testimony about employment rates from the accountant, from the executive director

of the Accrediting Commission, and from some CollegeAmerica employees.

¶ 135    The accountant testified CollegeAmerica was reporting graduates as employed in their field of study when they were employed in unrelated occupations.  He testified CollegeAmerica identified graduates with degrees in Business Administration as employed in their field of study because they obtained jobs such as a produce clerk at a grocery store, an employee working at the counter of a fast-food restaurant, and a sales associate at a clothing store.

¶ 136    For a third example, the trial court considered evidence of CollegeAmerica's independent third-party audits.  But, after comparing this evidence with CollegeAmerica's own records, the court decided the accountant's testimony was more credible than the auditor's testimony.

¶ 137    CollegeAmerica next asserts that it did not violate the Consumer Act because it never used the graduate employment rates reported to the Accrediting Commission in its advertisements.  But the court found otherwise.  In one instance, the court, relying on support in the record, determined that CollegeAmerica disclosed

the employment rates it reported to the Commission to prospective students through its website, in its TV advertisements, on its flyers, and on its postings around its Colorado campuses.

### 3. Claim Three: EduPlan

¶ 138 CollegeAmerica asserts that it accurately described the benefits of the EduPlan, and that the Attorney General's Consumer Act claim attacks "the value" of a CollegeAmerica degree. We disagree.

¶ 139 We conclude evidence presented at trial supported the trial court's determination CollegeAmerica misrepresented the benefits of the EduPlan to prospective and current students.

¶ 140 CollegeAmerica touted the EduPlan to prospective students through flyers, in its advertising, on its website, and during admissions interviews as a way to afford college and to re-establish credit.

¶ 141 But the reality was different. CollegeAmerica was aware that significant portions of its student population came from economically disadvantaged backgrounds and that these students were not likely to be able to afford a CollegeAmerica education. CollegeAmerica was also aware its students were facing a greater

likelihood of defaults on EduPlan payments during school and after graduation. For example, evidence at trial showed that, between 2003 and 2006, approximately 70% of EduPlan borrowers defaulted on their payments. Between 2010 and 2016, more than 80% of students were assessed late fees on their student loans. Despite being aware of these statistics, CollegeAmerica continued to tell prospective students through its advertising that the EduPlan made college more affordable and would help them re-establish their credit.

¶ 142    CollegeAmerica asserts that it did not violate the Consumer Act because it accurately described the benefits of the EduPlan. In support of this assertion, it cites a statement made by the judge who presided over the preliminary injunction hearing in this case, who said it accurately described the EduPlan. But a preliminary injunction hearing is not designed to be a full hearing at which a party presents its entire case. *Litinsky v. Querard*, 683 P.2d 816, 819 (Colo. App. 1984); *see also Governor's Ranch Pro. Ctr., Ltd. v. Mercy of Colo. Inc.*, 793 P.2d 648, 651 (Colo. App. 1990)(noting a party during a preliminary injunction hearing does not have "the incentive to develop [its] case as thoroughly as during trial"). So the

judge's findings during the preliminary injunction hearing were not determinative of the case's merits, which were developed in the proceeding held by the trial court. *See Mt. Emmons Mining Co. v. Town of Crested Butte*, 690 P.2d 231, 239-40 (Colo. 1984)(noting the findings made in connection with a request for a preliminary injunction are not conclusive on the ultimate merits of the controversy). For this reason, the statements made by the judge during the preliminary injunction hearing do not override the findings of fact made by the trial court after an extensive trial.

¶ 143    Next, we do not agree with CollegeAmerica's attempt to reframe the Attorney General's Consumer Act claim as a qualitative attack on the value of a CollegeAmerica education. We have already rejected CollegeAmerica's contention that the Attorney General's case constitutes an allegation of educational malpractice. Turning to this issue, the Attorney General did not allege a CollegeAmerica education lacked value because students were financially worse off after graduating; rather, the Attorney General alleged CollegeAmerica was misrepresenting the benefits of the EduPlan to students. In other words, the focus of the Attorney General's case was on the misrepresentations CollegeAmerica made to students

concerning the EduPlan, not on the quality of the education they received.

4. CollegeAmerica's Catalog Arguments: Claims Four Through Six

¶ 144 Because CollegeAmerica makes similar assertions about the LSO, EMT, and sonography claims, which were covered by Consumer Act Claims Four through Six, we will address these assertions together. Where CollegeAmerica makes an assertion unique to one of the Consumer Act claims, we will point it out.

¶ 145 CollegeAmerica submits that its catalog listings and advertisements for EMT, LSO, and sonography did not violate the Consumer Act. As to each claim, CollegeAmerica contends that (1) disclaimers on the catalog informed consumers of the unavailability of, or limitations on, specific programs; (2) evidence at trial did not prove it acted with an intent to deceive; and (3) the penalties assessed against it were excessive. Concerning specific claims, CollegeAmerica also submits that the statute of limitations bars the EMT claim.

a. Disclaimers

¶ 146 CollegeAmerica contends that, had the trial court conducted a holistic review of the advertisements, it would have determined that

its use of disclaimers mitigated any potential Consumer Act violation. We disagree.

¶ 147 Regarding the EMT courses, CollegeAmerica submits that the disclaimer on the 2006-2008 catalog stated the "EMT option may not be available at all campuses." It adds the 2009 catalog only listed EMT as among the "possible certifications and licenses" students could receive. And, it notes, a disclaimer on the catalogs used from 2006 to 2011 notified students the medical specialties program would "prepare students for possible certification or licensing" for LSO, so students were informed the program may not meet all requirements necessary for certification.

¶ 148 While use of a disclaimer may — in some cases — remedy deceptive advertising, a disclaimer alone is not always sufficient to eliminate the underlying deception. *See May Dep't Stores Co.*, 863 P.2d at 979 (noting disclosures are ineffective if the consumer may be confused by the disclosure or if the advertising is false). In this case, the trial court considered the record and determined that the disclaimers did not adequately remedy CollegeAmerica's deceptive advertising.

¶ 149    For example, the trial court found that CollegeAmerica was repeatedly notified that, as early as 2008, consumers were confused about the availability of EMT training.  One CollegeAmerica employee testified that, between 2009-2010, she had "constant issues" with students complaining they believed they would be able to get an EMT certification, but they did not learn it would not be possible until late in their academic careers.  Despite having this knowledge, CollegeAmerica continued to list EMT certification in its catalog, in admission binders, and on its website, and its admissions employees discussed EMT certification during interviews.  Even with the disclosure listed on the catalog, some students enrolled in the medical specialties program because they believed they could obtain EMT certification.

¶ 150    The record also supports the trial court's conclusion that the LSO disclaimers did not remedy CollegeAmerica's deceptive advertising.  Following a rule change by state regulators in 2005, CollegeAmerica's medical specialties program no longer met the minimum qualifications needed to allow students to sit for the LSO certification exam following graduation.  In response, CollegeAmerica added disclaimers to advertisements and the

62

catalog to clarify that the medical specialties program "would prepare students for possible certification" or the program "leads to certification."

¶ 151    But evidence at trial indicated the disclaimers did not remedy the students' confusion over LSO certification.  Despite knowing the medical specialties program did not meet the LSO certification requirements, CollegeAmerica continued to advertise that its coursework would prepare students to sit for the LSO exam.  Admissions employees continued to lead potential students to believe they would be prepared to sit for the LSO exam upon graduation.

¶ 152    As early as 2008, CollegeAmerica received a report containing complaints from students who believed they would be able to sit for the LSO exam following graduation.  In 2011, CollegeAmerica received a letter from the Accrediting Commission including statements from students such as the following:

- "[CollegeAmerica] should be honest about what programs you can be certified in because a lot of people wanted to do limited radiology and it's not available."

- "I was led to believe that I could obtain a radiology certification and found out in the middle of my education that information was untrue."

And, at trial, several former students testified they felt they had been misled into believing the medical specialties program would prepare them to sit for the LSO exam.

¶ 153 We conclude the record supports the trial court's determination the disclaimers used by CollegeAmerica did not remedy its deceptive advertising practices. Despite the disclaimers, students remained confused and continued to enroll in CollegeAmerica's programs under the impression they would be prepared to obtain EMT certification or sit for the LSO exam.

### b. Intent to Deceive

¶ 154 CollegeAmerica submits that the record does not contain evidence showing it knowingly engaged in a deceptive trade practice regarding the EMT, LSO, and sonography claims. Specifically, CollegeAmerica asserts that any representations about EMT certification and the sonography program in the catalogs were — at most — negligent or honest mistakes. Regarding the LSO claim, CollegeAmerica contends that its conduct was not knowingly

64

deceptive because it took steps to address student confusion after it became aware of their complaints. We are not persuaded.

¶ 155 To establish a claim under the Consumer Act, a plaintiff must show the defendant "knowingly engaged in a deceptive trade practice." *Crowe*, 126 P.3d at 204. The Consumer Act provides an absolute defense to misrepresentations caused by negligence or by an honest mistake. *Id.* Consequently, liability under the Consumer Act depends upon the knowledge or intent existing at the time of the advertising conduct. *Id.*

¶ 156 In this case, there was evidence in the record from which the trial court could infer CollegeAmerica knowingly engaged in deceptive trade practices. *See Chaffin, Inc. v. Wallain*, 689 P.2d 684, 688 (Colo. App. 1984)(noting intent may be proved by circumstances as well as direct proof). For example, from 2006 to 2010, CollegeAmerica advertised EMT as a possible certification in its course catalog, in a flyer, in its admissions binder, on its website, and during admissions interviews. But, during trial, CollegeAmerica admitted it did not provide EMT training at any Colorado location.

¶ 157    A report by a state agency indicated some former CollegeAmerica students "had enrolled believing . . . that completion would qualify them to sit for [an LSO] exam" or they would be able to get an EMT certification, "only to learn differently after having completed much of the program." Student complaints led several CollegeAmerica faculty members to share their concerns about the EMT and LSO programs with CollegeAmerica's management during faculty meetings. Despite being aware of the complaints and the students' confusion, CollegeAmerica continued to list EMT certification on its website as late as August 2010.

¶ 158    Similarly, evidence in the record supported the trial court's conclusion CollegeAmerica knowingly deceived students through its LSO advertisements. CollegeAmerica advertised LSO licensure as part of its medical specialties program on television, in mailers and in newspapers, on the internet, and during its admissions interviews. But, following the 2005 rule change to LSO licensure, CollegeAmerica was aware its program no longer met the minimum requirements necessary to sit for the exam after graduation. Between 2005 and 2010, CollegeAmerica received reports from agencies, including the Accrediting Commission, containing

66

multiple consumer complaints. These complaints were evidence students enrolled in the college believing they could sit for the LSO exam after graduation, only to learn late in their education that the program did not meet the minimum qualifications. Despite this, CollegeAmerica continued to advertise LSO certification from 2006 to 2011, and admissions employees continued to tell students the college's programming met the requirements for the LSO exam.

¶ 159    The record also supports the trial court's finding that CollegeAmerica knowingly deceived its students by advertising a nonexistent sonography program. After Mile High Medical Academy closed, CollegeAmerica told prospective students it intended to create its own sonography program the following year. But CollegeAmerica was then aware it lacked the equipment necessary to offer the program and the program had not been approved by the Accrediting Commission.

¶ 160    CollegeAmerica listed the sonography program in its catalog beginning in 2012. It began to receive inquiries from prospective students about the program, and some students enrolled in CollegeAmerica because admissions employees told them there would be a sonography program. While CollegeAmerica eventually

decided to forgo a sonography program, it continued to advertise the program in its catalog through April 2014.

¶ 161 Based on this evidence, we conclude the trial court could reasonably infer CollegeAmerica was acting with knowledge of its deceptive trade practices. In each situation, CollegeAmerica advertised a program would lead to a specified result, despite knowledge to the contrary that it would not. CollegeAmerica learned of these problems in various ways: from misled students who were confused and who filed complaints, from faculty members, and from reports issued by the Accrediting Commission. Yet CollegeAmerica continued to distribute the same misinformation.

¶ 162 In response, CollegeAmerica asserts that the court erred in deciding it possessed the state of mind necessary to violate the Consumer Act because its conduct was more akin to being negligent or to making honest mistakes. Regarding the sonography program, it claims it did not knowingly deceive students because it had a good faith intention to create the program. And, concerning the LSO exam, it also asserts that it did not knowingly deceive

students because it sent out a letter addressing certification requirements after the college learned of the student complaints.

¶ 163    But determining CollegeAmerica's intent was a question of fact left to the trial court's sound discretion. *Nixon v. City & County of Denver*, 2014 COA 172, ¶ 31. As discussed above, the court heard testimony and reviewed voluminous evidence before concluding CollegeAmerica knowingly engaged in deceptive advertising. As a result, CollegeAmerica's disagreement is with the trial court's factual findings; but, because the court's findings are supported by the record, we defer to its judgment. *See Shekarchian*, ¶ 27 (noting where the trial court acts as fact finder, we defer to its credibility determinations and will not disturb its findings of fact unless they are clearly erroneous).

### c.    Excessive Penalties

¶ 164    CollegeAmerica submits that the trial court erred in imposing the penalties it decided to impose. But CollegeAmerica only raises this submission in a handful of sentences, and it does not develop its reasoning for why the assessed penalties are impermissible. We therefore will not consider this submission. *See Gravina Siding & Windows Co. v. Gravina*, 2022 COA 50, ¶ 71 ("[I]t is not this court's

69

function to speculate as to what a party's argument might be." (alteration in original)(quoting *People v. Palacios*, 2018 COA 6M, ¶ 29)); *see also Galiant Homes, LLC v. Herlik*, 2025 COA 3, ¶ 14 (declining to "consider undeveloped and unsupported arguments" (citation omitted)).

### d. Statute of Limitations on EMT Claim

¶ 165 CollegeAmerica submits that the relevant advertising all occurred before December 5, 2009, so the Attorney General's claim about its EMT program is barred by the statute of limitations. We disagree.

¶ 166 We interpret a statute of limitations consistently with its purpose of promoting justice, avoiding unnecessary delay, and preventing the litigation of stale claims. *Murry v. GuideOne Specialty Mut. Ins. Co.*, 194 P.3d 489, 491 (Colo. App. 2008). Under the Consumer Act, a cause of action must be brought within "three years after the date on which the false, misleading, or deceptive act or practice occurred or the date on which the last in a series of such acts or practices occurred." § 6-1-115, C.R.S. 2025. If the evidence is disputed, the point at which a claim accrues is generally a question of fact left for the fact finder to resolve, *see Jackson v. Am.*

*Fam. Mut. Ins. Co.*, 258 P.3d 328, 332 (Colo. App. 2011), and the party asserting the statute of limitations as a defense bears the burden of proof. *Rademacher v. Greschler*, 2020 CO 4, ¶ 30.

¶ 167 The trial court decided CollegeAmerica continued to misrepresent the availability of EMT training past December 2009. This decision is supported by the record.

¶ 168 The Attorney General filed the case against CollegeAmerica on December 1, 2014, and the parties entered into a tolling agreement that was effective beginning December 5, 2012. When considered together with the Consumer Act's statute of limitations found in section 6-1-115, the effect of the tolling agreement on our analysis of this issue is clear: If all the acts or practices occurred before December 5, 2009, then the Consumer Act claim concerning the EMT program would be barred. But, if one act or practice in the series of acts or practices concerning the EMT program occurred after December 5, 2009, the claim would not be barred.

¶ 169 We conclude the claim was not barred. The trial court heard evidence indicating CollegeAmerica distributed its catalog containing misleading representations about EMT training from 2006 to 2008, misrepresented EMT training to prospective students

during admissions interviews from January 2008 until August 2009, distributed an admissions binder containing misleading statements about EMT training during 2009, and advertised the availability of EMT training on CollegeAmerica's Colorado-specific website until August 2010. This evidence supports the court's determination CollegeAmerica engaged in a series of misleading advertisements beginning as early as 2006, continuing through 2010, with at least one act — advertising EMT availability on its website — occurring after December 5, 2009.

¶ 170    We are not persuaded by CollegeAmerica's assertion that all the deceptive advertisements occurred before the tolling date and that the EMT advertisement on its website was "a simple mistake." The facts at trial concerning this issue were disputed, and we defer to the trial court's findings if they are supported by the record, which they are. *See Jackson*, 258 P.3d at 332. For example, the court was not required to accept testimony that including EMT training on the website during 2010 was a "simple mistake." When acting as the fact finder, it is the trial court's duty to determine the credibility of witnesses, and we will not disturb those findings absent clear error. *See Shekarchian*, ¶ 28.

## VI. Claims Against the Individual Defendants and the Living Trust

¶ 171    We turn to the claims raised by the individual defendants, Barney and Juhlin, and we will then address the claims raised by the Carl Barney Living Trust.

### A. Barney and Juhlin

¶ 172    Barney and Juhlin contend that the trial court made several errors applying to each of the six Consumer Act violations.

¶ 173    First, they assert that the evidence did not support the court's finding that the advertisements were false. We discussed the deceptive nature of CollegeAmerica's advertising above, and, because the same analysis and the same result applies to Barney and Juhlin's assertion, we will not repeat it now.

¶ 174    Second, they submit that the evidence did not establish they acted with the intent to deceive consumers.

¶ 175    Third, they raise contentions unique to their individual circumstances.

### 1. Applicable Law and Standard of Review

¶ 176    Individual corporate officers and agents can be held liable under the Consumer Act. § 6-1-113(1), C.R.S. 2025 ("The provisions of this article shall be available in a civil action for any

73

claim against any person who has engaged in or caused another to engage in any deceptive trade practice listed in this article."); *see also Hoang v. Arbess*, 80 P.3d 863, 870 (Colo. App. 2003). A person is defined as "an individual, corporation, business trust, estate, trust, partnership, unincorporated association, or two or more thereof having a joint or common interest, or any other legal or commercial entity." § 6-1-102(6), C.R.S. 2025.

¶ 177    Corporate agents are liable for torts of the corporation if they approved of, sanctioned, directed, actively participated in, or cooperated in such conduct. *See Colo. Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 28 (Colo. App. 2010)(citing *Hoang*, 80 P.3d at 867-68). An agent may "be held personally liable for his or her individual acts . . . even though committed on behalf of the corporation, which is also held liable." *Hoang*, 80 P.3d at 867. "At a minimum, personal liability attaches to a defendant who was directly involved in the conduct through conception or authorization." *Id.* at 868. But other direct involvement, "such as active participation or cooperation, specific direction, or sanction of the conduct, also may be sufficient." *Id.* Whether an individual defendant approved of, directed, actively participated in, or

cooperated in the corporation's negligent conduct is usually a question of fact. *Id.*

¶ 178 Barney and Juhlin assert that the trial court's application of *Hoang* stretched its holding beyond its breaking point. They cannot be held liable under the Consumer Act, they add, because they did not directly engage in CollegeAmerica's alleged violations and because extending liability to their conduct would be tantamount to imposing liability on individuals simply by virtue of their positions as corporate officers.

¶ 179 But *Hoang* did not impose liability on corporate officers merely because they were corporate officers. Rather, *Hoang* imposed important limits on such liability. For example, "an officer of a corporation cannot be held personally liable for a corporation's tort solely by reason of his or her official capacity." *Id.* at 867. And, "[t]o be found personally liable to third persons for a tort, the officer of a corporation *must have participated* in the tort." *Id.* at 868 (emphasis added). *Hoang* has been around for over twenty years. Although Barney and Juhlin claim it can be used to unfairly expand the liability of corporate officers, they have not cited, and we have

not found, any case since *Hoang* was decided indicating *Hoang* leads to such unfair results.

¶ 180   We reject Barney and Juhlin's invitation to ignore *Hoang*; instead we choose to follow its reasoning. Accordingly, we conclude, for the following reasons, substantial evidence supported the trial court's findings that both men knowingly directed and participated in CollegeAmerica's misrepresentations.

### 2.   Knowledge of Deception and Intent to Deceive

¶ 181   Barney and Juhlin submit that they lacked knowledge that any of CollegeAmerica's advertising was false and that they did not intend to deceive prospective and current students. We disagree.

¶ 182   As we understand their contention, Barney and Juhlin seek to challenge the adequacy of the evidence supporting the trial court's findings that (1) they had knowledge specific CollegeAmerica advertisements were false or misleading, and (2) they intended to deceive students by disseminating the false or misleading advertisements. But their contention asks us to reweigh the evidence and to substitute our judgment for that of the trial court. This we cannot do. *Id.*

### 3. Specific Attacks on Consumer Act Claims

¶ 183   We turn to Barney and Juhlin's attacks on each of the trial court's findings concerning the six Consumer Act claims.

### a. Claim One: National Wage Data

¶ 184   We conclude there is sufficient evidence in the record to support the trial court's determination Barney and Juhlin were liable for deceptively using national wage data in CollegeAmerica's advertising.

¶ 185   First, evidence showed Barney and Juhlin acted with knowledge that CollegeAmerica's use of the national wage data in advertising was misleading.  For example, there was evidence showing Barney was integral to the creation, operation, and administration of many of CollegeAmerica's programs and much of its advertising.

¶ 186   Before 2012, Barney was president and chief executive officer of a company providing senior management oversight and support services to for-profit colleges, including CollegeAmerica.  Barney controlled this company through the Carl Barney Living Trust, which was the company's sole shareholder.  Under Barney, this

company directly provided training, marketing, and accounting services to CollegeAmerica.

¶ 187 This company merged into a successor company, the Center for Excellence in Higher Education, and, from 2012 to 2014, Barney was the chief marketing officer for the successor company.

¶ 188 Throughout the period covered by the Attorney General's complaint, Barney exercised control over the day-to-day operations of CollegeAmerica via written policies and procedures. He wrote letters, memos, and directives that CollegeAmerica's staff was expected to follow.

¶ 189 Barney also exercised significant control over CollegeAmerica's training and advertising programs. He had copyrights on admissions and financial planning manuals, and he issued directives included in them. As the chief marketing officer, Barney controlled CollegeAmerica's advertising through policies and directives he had written. In 2008, he authored a checklist applying to all of CollegeAmerica's advertising. He was responsible for reviewing all advertisements until mid-2011 to 2012, when Juhlin was hired. From 2010 until the time this case was filed,

either Barney or Juhlin reviewed approximately 90% of CollegeAmerica's advertisements.

¶ 190 In 2014, Barney issued a letter directing staff to use national wage data in CollegeAmerica's advertisements. He also began the process of collecting salary data from CollegeAmerica's graduates. He received regular information about the starting salaries of CollegeAmerica's graduates, which he distributed to CollegeAmerica's executives and career services staff.

¶ 191 This evidence supports the trial court's finding Barney knew CollegeAmerica's use of the national wage data was misleading. Barney created the procedures and checklists staff were required to use when creating advertisements, and he was responsible for approving all advertisements used by CollegeAmerica. He also created the process for collecting wage data from CollegeAmerica graduates, and he issued directives requiring CollegeAmerica to use national wage data in advertisements.

¶ 192 Likewise, the evidence supports the trial court's imposing liability on Juhlin for his role in CollegeAmerica's use of national wage data in its advertisements. CollegeAmerica's policy required Juhlin or Barney to approve all of CollegeAmerica's advertisements.

Juhlin received monthly operational reports including campus-level information about graduate wages, and he had access to CollegeAmerica's data on graduate salaries. Mailers sent out as recently as 2014 — when Juhlin was CollegeAmerica's chief executive officer — contained misleading national wage information. These mailers were like approximately seventy-five other advertising campaigns conducted by CollegeAmerica between 2010 and 2015.

¶ 193 The record also supports the trial court's finding that Barney and Juhlin intended to deceive students by using the national wage data in advertising. At trial, a former director of internet advertising for the Center for Excellence in Higher Education acknowledged CollegeAmerica used information about earning potential — using only national wage information — on its websites to "attract students" to enroll. But the only salary information on the websites was the national wage information. And, as noted above, the advertising strategy was created and directed by Barney and Juhlin.

¶ 194 Finally, in 2015, the Accrediting Commission notified the college its "advertisements include[d] information regarding potential salaries . . . [that] may [have been] misleading." Juhlin informed the Commission that, "effective May 2015,

[CollegeAmerica] . . . no longer puts any income or salary information into its advertisements." Despite this assurance, CollegeAmerica continued to include salary information in its advertisements.

### b. Claim Two: Employment Outcomes

¶ 195 We conclude the record supports the trial court's determination that Barney and Juhlin were liable for knowingly misrepresenting graduate employment rates by posting inflated employment rates online and around CollegeAmerica's Colorado campuses.

¶ 196 The Accrediting Commission required member schools to file annual reports including metrics, such as the percentage of graduates who found employment in a training-related field. CollegeAmerica submitted its annual reports to the Commission in October or November of each year.

¶ 197 Witnesses at trial testified CollegeAmerica was aware wage information and employment placement rates were important to prospective students' decisions to attend CollegeAmerica. CollegeAmerica leveraged this knowledge by emphasizing high employment rates for specific degree programs during its

admissions process, on its website, and on postings across its campuses.

¶ 198    As is relevant to our analysis, Barney was an active participant in CollegeAmerica's misleading use of the inflated employment rates.  While at CollegeAmerica, Barney consistently received operational reports containing detailed information about CollegeAmerica's graduates.  And, as the architect of CollegeAmerica's training manuals and admissions, he was essential in directing staff training and the methods used by employees during the admissions process to convince students to enroll.  He was also responsible for reviewing CollegeAmerica's advertisements, which included approving the representations in them.

¶ 199    Juhlin engaged in similar conduct.  Like Barney, he approved the representations made in CollegeAmerica's advertisements by reviewing and authorizing nearly all the advertisements used by the college.  He received monthly operations reports including information on graduates' wages and employment placement rates. He attended and participated in the training of admissions staff.

¶ 200    The record supports the trial court's finding that Barney and Juhlin intended to deceive CollegeAmerica's students. They were aware wage and employment information was necessary for students to make an informed decision about enrolling in CollegeAmerica. They both consistently received information about starting salaries and employment of CollegeAmerica's graduates. And they were both aware of the significant problems surrounding the wage and employment information they used that have been described above.

### c. Claim Three: EduPlan

¶ 201    We conclude the record supports the trial court's finding Barney and Juhlin knowingly misrepresented the benefits of CollegeAmerica's EduPlan because they actively participated in CollegeAmerica's misrepresentations about those benefits.

¶ 202    Barney created the EduPlan in 2002. He also drafted and revised the college's procedures and directives relating to the EduPlan. CollegeAmerica advertised the EduPlan as a means by which students could make college affordable and re-establish their credit. Both Barney and Juhlin were responsible for reviewing and

approving all advertisements about the EduPlan used by CollegeAmerica since 2010.

¶ 203   Admissions employees were responsible for administering the EduPlan program in accordance with the directives Barney authored.  The employees were trained to minimize students' objections under the plan to encourage higher enrollment.  Admissions employees typically spent about fifteen minutes explaining the EduPlan paperwork, and only a few minutes reviewing the monthly payment plans.

¶ 204   At trial, a CollegeAmerica admissions employee testified that about twenty-five to thirty percent of students appeared confused about the EduPlan, and she raised this concern with her supervisor.  CollegeAmerica also received feedback students were "overloaded" with the information they received on the same day, and prospective students told the college they did not want to take out loans.  But the college's financial aid planners were trained to provide students with the EduPlan information to see if they could change the students' minds.  Some employees also raised concerns that some prospective students could not afford CollegeAmerica's tuition and the EduPlan payments, but these concerns were

dismissed because, "in the end, it was the admission consultant's job to push forward with enrollment."

¶ 205   Barney and Juhlin were aware significant numbers of students were unable to afford their EduPlan payments. The entity hired to service the EduPlan sent monthly lists of delinquent EduPlan borrowers to CollegeAmerica.

¶ 206   Barney authorized the sale of the EduPlan debt to buyers in both 2007 and 2013.

### d.   Claim Four: LSO Certification

¶ 207   We conclude the record supports the trial court's finding that Barney and Juhlin knowingly misrepresented LSO licensure as part of CollegeAmerica's medical specialties program.

¶ 208   Barney was an active participant in the creation of CollegeAmerica's medical specialties program, training CollegeAmerica's admissions staff, and reviewing and approving the LSO advertisements. He created the program in the early 2000s.

¶ 209   In 2009, Barney identified LSO licensure as an "advertising opportunit[y]" for the college. From 2008 to 2011, CollegeAmerica advertised its medical specialties program as leading to LSO certification. CollegeAmerica made similar statements in its course

catalog, which was published from 2006 to 2011. Barney approved CollegeAmerica's LSO advertisements because he reviewed and authorized nearly all of them during this period. And the procedures in the manual Barney wrote directed employees to continue telling students that LSO certification was available under the medical specialties program through at least 2012.

¶ 210    Juhlin was also an active participant in CollegeAmerica's dissemination of misleading LSO advertisements. Like Barney, Juhlin shared responsibility for reviewing and approving all of CollegeAmerica's advertisements, including advertising about the LSO program on television, and approving advertisements and catalog listings running through 2011. Juhlin was also aware CollegeAmerica's programs did not prepare students for the LSO licensure exam.

¶ 211    Although they were aware of the state regulators' 2005 rule change resulting in CollegeAmerica's medical specialties program no longer meeting the clinical hour requirement need for students to sit for the LSO examination upon graduation, Barney and Juhlin continued to make misleading representations about the LSO programs to prospective students.

¶ 212    For example, mailed advertisements sent from 2006 to 2011 told students CollegeAmerica's programs would "prepare students for possible certification or licensing" in LSO. Additionally, flyers posted on CollegeAmerica's Denver campus inaccurately informed students the only prerequisite for the LSO exam was "completi[ng] all the courses, including [the] externship." Juhlin testified he was aware this inaccurate flyer was posted around the campus sometime around 2010. Admissions employees, complying with CollegeAmerica's procedures created by Barney, continued to tell students their coursework would prepare them to sit for the LSO exam upon graduation.

¶ 213    As early as 2008, CollegeAmerica began receiving complaints from disappointed students who thought they would be able to sit for the LSO exam after graduating. After receiving these complaints, Barney sent out a letter addressing certification requirements for all of CollegeAmerica's programs. But again, in 2011, the Accrediting Commission sent a letter to CollegeAmerica informing it of student complaints about its representation of LSO certification. Despite this information, Barney and Juhlin

continued to review and approve CollegeAmerica's misleading representations about LSO certification.

### e. Claim Five: EMT Certification

¶ 214    We conclude the record supports the trial court's finding Barney knowingly misrepresented the availability of EMT training at CollegeAmerica's Colorado campuses.  We also conclude, however, that the court erred when it found that Juhlin knowingly did so because he was not employed at CollegeAmerica during the relevant time.  Nevertheless, we conclude that this single error was harmless, considering all the other misrepresentations concerning other claims in which Juhlin was involved.  *Cf. Terra Mgmt. Grp., LLC v. Keaten,* 2025 CO 40, ¶ 42 (putative error in making an adverse inference was harmless when a court also relied on other evidence in making findings); *In re Marriage of Adamson,* 626 P.2d 739, 741 (Colo. App. 1981)(an evidentiary ruling did not amount to reversible error when other cumulative evidence supported the judgment).  The judgments against both Barney and Juhlin therefore stand.

¶ 215    Returning to Barney, he approved CollegeAmerica's misleading representations about the EMT certification by reviewing and

approving the advertisements concerning it. For example, between 2006 and 2010, CollegeAmerica advertised students could earn the EMT certification through course catalogs, flyers, admissions binders, its website, and admissions interviews. The advertisements were specific to CollegeAmerica's Colorado and Wyoming campuses, and they contained a general disclaimer indicating not all locations provided the EMT option. But CollegeAmerica *never* offered the EMT certification at any of its Colorado campuses, and there were *no* specific disclosures the EMT certification was not offered in Colorado.

¶ 216 Barney was also instrumental in creating the procedures and training followed by admissions employees. During admissions interviews, CollegeAmerica employees routinely informed students the medical specialties program would prepare students for the certifications listed in the brochures, including the EMT certification. Students also testified they enrolled in the medical specialties program with the understanding it would lead to an EMT certification.

¶ 217 Evidence supports the trial court's finding Barney intended to deceive prospective students by approving misleading

advertisements about CollegeAmerica's EMT program. Students testified that, based on CollegeAmerica's advertisements, they enrolled in the medical specialties program believing they would eventually obtain the EMT certification.

¶ 218    The Accrediting Commission sent a letter to CollegeAmerica in 2008 informing it students were enrolling in the medical specialties program based on their understanding the program would lead to the EMT certification. Despite this letter, CollegeAmerica continued to advertise the EMT certification as an available option in Colorado through 2010.

### f.  Claim Six: Sonography

¶ 219    We conclude the record supports the trial court's finding that Barney and Juhlin knowingly made false representations about the availability of a sonography degree program at CollegeAmerica's Colorado campuses. Barney and Juhlin actively participated in CollegeAmerica's false representations by reviewing and approving CollegeAmerica's advertisements and by creating and controlling the training and procedures used by the college's admissions employees.

¶ 220   In 2010, CollegeAmerica began informing prospective students it would launch a sonography program within the next year.  By 2012, CollegeAmerica began advertising a sonography program in its course catalog.  These advertisements continued until at least April 2014.  Under CollegeAmerica's procedures, all these advertisements required either Barney's or Juhlin's approval.

¶ 221   Admissions employees also encouraged students interested in sonography to enroll in CollegeAmerica.  Employees informed students CollegeAmerica would have a sonography program, adding students should enroll in the health administration program in the meantime because that program's coursework would correspond with the sonography program.  Students testified they would not have enrolled in CollegeAmerica had they known there was a possibility it would not offer sonography.

¶ 222   CollegeAmerica advertised a sonography program that never existed.  It took initial steps to obtain accreditation for a sonography program through the Accrediting Commission, but it never completed the process.  After conducting a market study in late 2012, CollegeAmerica decided not to create a sonography

91

program. But it continued to list sonography as a degree after it decided to forgo creating the program.

¶ 223 The record also supports the trial court's finding Barney and Juhlin intended to deceive prospective students. Despite deciding, in 2012, CollegeAmerica would not create a sonography program, Barney and Juhlin continued to review and approve advertisements in the college's catalog telling students it offered a sonography program. Indeed, Barney and Juhlin continued to advertise the nonexistent sonography program even after students and employees raised concerns. In early 2013, the Accrediting Commission sent CollegeAmerica a complaint from a prospective student who was concerned that the catalog listed sonography as an option but that no Colorado campus offered the program. And a dean on CollegeAmerica's Fort Collins campus said there were frequent inquiries from students about the sonography program, but CollegeAmerica "can't offer it, and I find that a little unsettling with potential students. They all follow-up with well why does it say you have it in the catalog?"

¶ 224 At a meeting in late 2013, the executive team, which included Juhlin, decided to leave the sonography program in the catalog.

92

The sonography program was listed in the catalog until at least April 2014.

### 4. Barney and Juhlin's Other Contentions

¶ 225    Both Barney and Juhlin assert that (1) the reasonable consumer standard applies to determining whether the national wage data advertisement violated the Consumer Act; (2) the trial court engaged in improper policymaking by requiring disclosure of CollegeAmerica-specific wage data; and (3) no Consumer Act violations could have occurred where CollegeAmerica's advertising was truthful.

¶ 226    These assertions, however, are the same as those raised by the corporate defendants, and they are based on the same factual allegations. We reject these contentions based on our previous analysis. *Supra* Part V.A-B.

### B. The Carl Barney Living Trust

¶ 227    The living trust submits that it cannot be held liable for the Consumer Act violations under the alter ego theory based solely on Barney's control over the trust. Under these circumstances, we disagree.

¶ 228     To establish liability under an alter ego theory, a court must

decide (1) the trust is the alter ego of the defendant; (2) the trust's

separate form was used to perpetrate a fraud or defeat a rightful

claim; and (3) piercing the veil would achieve an equitable result.

*Dill v. Rembrandt Grp., Inc.*, 2020 COA 69, ¶ 42.  Although the trust

appears to challenge all three elements of this test in its briefing, we

shall only address its contention concerning the first element

because it did not sufficiently develop its contentions concerning

the second and third elements.  *See Sinclair Transp. Co. v.*

*Sandberg*, 2014 COA 76M, ¶ 74 "[B]ald assertions of error that lack

any meaningful explanation or support in legal authority . . .

violate[] C.A.R. 28(a) and will not be addressed.").

1.  Applicable Law and Standard of Review

¶ 229     We review de novo a court's legal conclusions in finding an

alter ego and in piercing the corporate veil, and we examine its

related factual findings for clear error.  *Sedgwick Props. Dev. Corp.*

*v. Hinds*, 2019 COA 102, ¶ 22.  We defer to the court's factual

findings and disturb them only when they are not supported by the

record.  *Amos v. Aspen Alps 123, LLC*, 2012 CO 46, ¶ 25.

¶ 230    Under the first factor of the *Dill* test, the court must determine whether the corporate entity is the alter ego of the person or entity at issue. *Dill*, ¶ 28. An alter ego relationship exists when a legal entity, such as a corporation or an LLC, is merely an instrumentality for the transaction of the shareholders' or members' affairs and "there is such unity of interest in ownership that the separate personalities of the corporation [or LLC] and the owners no longer exist." *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006)(citation omitted). In making this determination, courts consider factors such as whether (1) the entity is operated as a distinct business entity; (2) funds and assets are commingled; (3) adequate business records are maintained; (4) the nature and form of the entity's ownership and control facilitate misuse by an insider; (5) the entity is used as a "mere shell"; (6) the entity is thinly capitalized; (7) legal formalities are disregarded; and (8) the entity's funds or assets are used for nonbusiness purposes. *Dill*, ¶ 29. Courts consider the specific facts of the case but need not find every factor is satisfied to decide an entity is an alter ego. *Id.* Depending on the entity in question, some of the factors will not readily apply. *Sedgwick Props.*, ¶ 36.

## 2. Analysis

¶ 231 We conclude the record supports the trial court's conclusion that the trust operated as Barney's alter ego.

¶ 232 First, the way the trust operated, and the nature and form of its ownership, drastically increased the risk of its misuse. Barney was the sole shareholder, trustee, and beneficiary of the trust. He had control over the trust's operations, and he benefited from its business decisions.

¶ 233 Second, Barney used his control over the trust to exert control over the Center for Excellence in Higher Education. The trust made two loans, one of $200,000,000 and one of $231,000,000, to finance the Center's creation and its merger with other for-profit colleges Barney owned, and he was the Center's sole member and chairman. As the trust's sole shareholder, he was the Center's largest creditor, and he used the trust to fund and to control the Center's operations. In these ways, Barney's position and control blurred the lines between him and the trust. *See Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc.*, 519 F.2d 634, 638 (8th Cir. 1975)(piercing the corporate veil was proper when, among other things, evidence showed an individual was the corporation's

sole shareholder; the individual was the corporation's sole incorporator; and only the individual gave loans to and borrowed money from the corporation).

¶ 234 After the 2013 merger, the Center for Excellence in Higher Education filed a change of ownership application with the Department to maintain CollegeAmerica's eligibility to participate in Title IV funding. But the Department denied the Center's application because it determined that it was not operated as a nonprofit. The Department reached this conclusion in part because "the [t]rust retained the benefit of a continued stream of Title IV revenues and Mr. Barney obtained significant control of [the successor company], and, by extension, retained control of the [various colleges]." The Department decided "the payments made under the [loans], which are contingent on [the Center] 'making money,' are essentially profit distributions to the trust — substantially the same as it received when it was the sole shareholder of the [various colleges]."

¶ 235 The Department's denial of the successor company's application focused largely on the Department's concern that Barney's control and his use of the trust would allow him to control

97

and extract profits from the Center.  While we are not bound by the decisions of federal agencies, we think the Department's reasoning is persuasive, and it supports our conclusion the Center was Barney's alter ego.

¶ 236    The trial court's and remand court's judgments are affirmed.

CHIEF JUDGE ROMÁN and JUDGE TOW concur.